UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 2: 07-39-S-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| WILLIAM J. GALLION and | ) | **MEMORANDUM OPINION** |
| SHIRLEY A. CUNNINGHAM, JR., | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendants William Gallion, Shirley Cunningham, Jr., and Melbourne Mills were indicted by a federal grand jury on June 14, 2007. [Record No. 1] The original indictment charged that the defendants committed wire fraud in connection with the settlement of a tort action filed in state court involving the defendants' former clients who had used certain prescribed diet drugs. The matter proceeded to trial before United States District Judge William O. Bertelsman beginning May 12, 2008, with the matter being submitted to the jury on June 24, 2008. [Record Nos. 408, 489]. After several days of deliberations, the jury advised that it was unable to return a unanimous verdict on the counts submitted for its consideration concerning Defendants Gallion and Cunningham.[1] As a result, on July 3, 2008, a mistrial was declared with respect to these defendants. [Record No. 505]

---

[1] The jury returned a verdict of acquittal with respect to Defendant Mills on July 1, 2008. [*See* Record Nos. 499 and 500.]

-1-

The matter was reassigned to the undersigned on July 7, 2008.[2] [Record No. 504]  On September 3, 2008, the grand jury returned a superseding indictment against Defendants Gallion and Cunningham. [Record No. 599]  The superseding indictment contained nine substantive counts and one forfeiture count.  As discussed more fully below, the substantive charges again alleged that the defendants committed wire fraud during the period May 1, 2001, through June 2005.  In Count 10, the grand jury alleged that, as a result of the

---

[2]Defendants Mills, Cunningham and Gallion were ordered detained pending trial on September 12, 2007. [Record No. 78]  In relevant part, Judge Bertelsman found that the defendants presented a serious risk that they would flee the jurisdiction and/or obstruct justice.  After the jury in the first criminal trial was unable to reach a verdict as to Defendants Cunningham and Gallion, the undersigned reconsidered the issue of detention.  On August 22, 2008, the defendants were released to home detention. [Record No. 582]  Defendant Gallion was required to post a surety bond in the sum of $2,500,000.  Defendant Cunningham's surety bond was set at $1,250,000.

A number of restrictions were included in the defendants' respective orders of release which were intended to prevent the transfer of assets to third parties.  Additionally, the Court prohibited Defendant Gallion from having any direct or indirect contact with Melissa Green or Joseph Gallion.  The Orders Setting Conditions of Release also contained the following specific provisions preventing the defendants from transferring assets.

The defendant shall terminate and/or revoke any previously held Power of Attorney.

The defendant, his power of attorney, or other individual acting on his behalf shall not disburse any funds from any accounts, any real property, or other items of value, over $5,000 at one time or a total of $10,000 in one month without the approval of the Court.  This includes monies personally held by the defendant, held in trust or corporation or business that the defendant has a financial interest, retirement or similar accounts or monies being held for the defendant by third parties.  The defendant will be required to submit a monthly accounting to the probation office within the first 5 days of each month, of all one-time expenditures in excess of $5,000 or monthly expenditures exceeding $10,000.  The defendant is restricted from giving any gifts via himself, his companies, trust or other financial entity of which he has control in excess of $1,000.

[See Record No. 592, ¶¶ 8, 9 and Record No. 610, ¶¶ 9, 10.]

defendants' unlawful conduct, the United States was entitled to a monetary judgment of $94,619,145.81, representing the proceeds the defendants obtained as a result of their unlawful conduct. Substitute assets were also sought and identified in Count 10. The property listed as substitute assets included fifteen separate parcels of real property in Kentucky and Florida.

The second trial involving Defendants Gallion and Cunningham commenced on February 17, 2009. [Record No. 720] On April 3, 2009, the jury returned a guilty verdict against both Defendants on all nine substantive counts. [Record Nos. 820, 821] In the subsequent forfeiture proceeding, the jury returned a verdict of forfeiture consisting of a $30,000,000 money judgment, including specified financial accounts. [Record No. 831] A preliminary order of forfeiture was entered on June 17, 2009. [Record No. 856] This judgment was later amended on July 24, 2009, and August 20, 2009, to include vehicles, additional real property, certain funds held at financial institutions, and the business entity Tandy, LLC. [Record Nos. 901 and 964] These orders direct the forfeiture of specific assets of the Defendants to satisfy the money judgment. Following entry of these orders, the United States provided notice to parties who might have an interest in the property subject to forfeiture so that they could timely assert a claim. The matter is currently pending for consideration of a number of claims concerning the property subject to forfeiture.

## I.    Facts Relevant to Several Claims

The Superseding Indictment filed on September 3, 2008, contains an excellent summary of the defendants' fraudulent conduct.  And because the timing of certain events is relevant to several of the forfeiture issues currently pending, the Court finds it helpful to quote this document at length.  The Superseding Indictment alleges – and the United States proved at trial – the following:

2.    At all times relevant to the information set out in [the Superseding] Indictment, William J. Gallion and Shirley A. Cunningham, Jr. . . . were attorneys licensed to practice law in the Commonwealth of Kentucky.

4.    In the late 1990, civil actions began nationwide concerning the use of and injuries caused by the use of combination diet drugs, commonly referred to as Fen-Phen.  Gallion, Cunningham and Mills, solicited and undertook representation of many individuals who had used these diet drugs and were harmed. . . .

5.    Gallion, Cunningham and Mills entered into joint representation agreements, including division of fees, among themselves and other attorneys for the representation of their clients allegedly harmed by the use fo the drug, Fen-Phen. . . .

6.    In July 1998, Gallion, Cunningham and Mills, filed on behalf of their clients  a civil action styled as Boone County Kentucky Circuit Court Civil Action Number 98-CI-795.  Eventually, they jointly represented 440 clients in this case.  The named defendants in the action were American Home Products (AHP), Bariatrics, Inc., and Dr. Rex Duff.  The action was certified as a class action by the Boone Circuit Court on May 5, 1999.

7.    Boone County Kentucky Circuit Court Civil Action Number 98-CI-795 was settled through mediation on May 1, 2001.  On that date, AHP initially settled the claims of Gallion, Cunningham and Mills' 440 clients for $200,000,000 based upon negotiations and representations made by the attorneys as to the degree of injuries suffered by their

-4-

clients. . . .  Later, AHP paid an additional $450,000 to compensate a claimant whose injuries had been underestimated. . . .

8.  The funding of the Settlement Agreement was also contingent upon the parties obtaining an order from the Boone Circuit Court decertifying the class and dismissing the complaint.  The Settlement Agreement also required the execution of a side agreement (Side Letter) between the parties. . . .  The Side Letter was executed on May 30, 2001. . . .

9.  On May 16, 2001, the Boone Circuit Court entered an order decertifying the class and dismissing the action. . . .

12.  Beginning in May 2001, the clients were contacted by representatives of Gallion, Cunningham and Mills, and individually scheduled to come to . . . Lexington, Kentucky, to meet regarding the case.  At that meeting, the clients were advised for the first time that a settlement had occurred.

13.  At the direction of Gallion and Cunningham, neither Gallion nor Cunningham, nor their representatives disclosed the total amount of the settlement to any of the 440 clients.  They further failed to disclose the existence and nature of all claims involved and the participation of each person involved in the settlement, in direct contradiction of the terms of the Settlement Agreement.

18.  The sum of $200,450,000 was paid by AHP on behalf of the 440 clients, in increments between approximately June 19, 2001, and November 5, 2001, and wired into an escrow account . . . held in the name of Cunningham at Bank One, in Lexington, Kentucky.  Between on or about June 2001 and the end of that year, checks were issued to the clients from this account. . . .  By the end of 2001, the clients had received a total of approximately $45,000,000.  The amount of $7,500,000 was set aside in the event contingencies occurred triggering the need for indemnification.  The remaining amount of approximately $147,000,000 went to the benefit of Gallion and Cunningham, and others unknown to the clients.

19.  The first increment of $150,000 was wired by AHP into the Escrow Account on June 19, 2001.  That day, approximately $45,000,000 was transferred from the Escrow Account into the personal accounts of Gallion, approximately $38,000,000 was transferred into the personal

accounts of Cunningham, and approximately $9,000,000 went to the personal account of Mills.

20.    By the end of November 2001, Gallion had taken approximately $54,000,000 of the $200,450,000 settlement, Cunningham had taken approximately $48,000,000 of the $200,450,000 settlement, and Mills had taken approximately $17,000,000 of the $200,450,000 settlement. The amount of $7,500,000 continued to be set aside in the event contingencies occurred triggering the need for indemnification. The remaining $25,000,000 from the $200,450,000 settlement was used to pay others whom the clients had no knowledge.

21.    *As a result of complaints to the Kentucky Bar Association (KBA) regarding the handling of the Fen-Phen settlement money, in January 2002, KBA Bar Counsel began an investigation into the manner in which the civil settlement was handled. On January 29, 2002, Bar Counsel applied for four subpoenas for records maintained by Gallion, Cunningham, and Mills, and Bank One of Kentucky, where the escrow account for the settlement funds was maintained.* The subpoenas for Gallion, Cunningham and Mills required that they each produce records pertaining to their involvement and handling of the lawsuit. The subpoena for Bank One of Kentucky sought financial records relating to the case. *This application was served on Mills on January 30, 2002.*

22.    In response to the application for subpoenas, Gallion and Cunningham returned to the Boone Circuit Court and requested an order approving their fees. This request was made without informing any party, including their own 440 clients, and without submitting any written documentation justifying or supporting the fees they sought. During this ex parte meeting, Gallion and Cunningham purposely failed to advise the court they had already taken fees from their clients pursuant to their contingency fee agreements. . . . The did not tell the court that the majority of the funds had been transferred into their own personal accounts, instead of having been properly maintained in an escrow account within the state of Kentucky. . . .

23.    *On February 11, 2002, the Kentucky Bar Association Inquiry Commission conducted a hearing on the application by KBA Bar Counsel for the subpoenas. Shortly after the hearing, the Inquiry Commission entered an order authorizing the issuance of the requested subpoenas.*

-6-

24.    The same day the Inquiry Commission approved the application for the subpoenas, Gallion and Cunningham caused five wire transfers totaling approximately $59,000,000 to be made from personal accounts of Gallion and Cunningham, into a First Union Bank account in Florida held jointly in the name of Gallion, Cunningham and Mills. . . . This account had been opened on or about June 2001.

25.    On February 14, 2002, Gallon was personally served with the subpoena demanding records relating to the Fen-Phen action. The following day, February 15, 2002, Gallion and Cunningham submitted or caused to be submitted an order, to be signed by the Boone Circuit Court judge, approving the requested fees and the payment of a second distribution. This order, which was not entered into the record until June 6, 2002, did not set forth the amount of fees actually being awarded.

26.    Within approximately six weeks of the issuance of the subpoenas for the escrow account at Bank One of Kentucky and for the records of Gallion, Cunningham and Mills, Gallion, Cunningham and Mills began to make a second distribution of the settlement funds to their clients.

28.    On March 27, 2002, Gallion requested that approximately $26,000,000 be transferred from the Defined Trust Account in Florida into a second First Union Account in Florida, referred to as the Kentucky Diet Drug Disbursement Account. This account was utilized to issue the second distribution checks to the clients. The total amount of the second distribution to the clients was approximately $28,000,000.

33.    By the end of January 2003, Gallion had taken approximately $31,000,000 in attorneys fees, Cunningham had taken approximately $21,000,000 in attorneys fees, and Mills had taken approximately $23,000,000 in attorney fees. Approximately $31,000,000 was used to pay others whom the clients were unaware.

34.    By the end of 2004, Gallion, Cunningham and Mills had transferred from the Defined Term Account at First Union Bank in Florida, $20,000,000 to a series of accounts in the name of the Kentucky Fund For Healthy Living.

[*See* Record No. 599 (emphasis added).] The specific transfers giving rise to the individual substantive charges of wire fraud are outlined in paragraphs 78 through 85 of the

Superseding Indictment.  [*Id.*]  The dates of these transfers cover the period March 17, 2004, through December 9, 2004.

Based on the evidence presented during second trial, the jury concluded that the defendants committed the various acts of wire fraud.  This evidence clearly established the defendants were aware of the Kentucky Bar Association's investigation of their conduct as early as February 2002.  From this point forward, the defendants clearly attempted to cover-up their fraud and prevent prosecution.  It is equally clear to the Court that, by mid-2004, individuals closely associated with Defendants Gallion and Cunningham would have been aware of the investigation and allegations that the defendants had engaged in fraudulent conduct in obtaining significant fees in the Fen-Phen litigation.

## II.    The Claims of Patricia Cunningham

Defendant Cunningham's current wife, Patricia Cunningham, initially submitted a claim to eight parcels of real property in which she claims an ownership interest.  [Record No. 889]  Later, she rescinded her claims involving two of the parcels.[3]  Therefore, her present claim involves six properties held in the names of three corporate entities: Hillcrest Farm I, LLC, Hillcrest Farm II, LLC and CWSJ, LLC.  The properties which are the subject of her claims include the following:

---

[3]The parcels in which claims were rescinded are described as property located at 4088 Georgetown Road in Lexington, Kentucky, and 110 North Federal Highway in Ft. Lauderdale, Florida.  On November 6, 2009, the Ft. Lauderdale property was dismissed from this action upon motion by the United States.  [Record No. 1115]

1.      Hillcrest Farm I, LLC, 53 acres, located in Georgetown, Kentucky and subject to the Preliminary Order of Forfeiture dated June 17, 2009, ¶ (3)(E) [Record No. 856];

2.      Hillcrest Farm I, LLC, 28 acres, located in Georgetown, Kentucky and subject to the Preliminary Order of Forfeiture dated June 17, 2009, ¶ (3)(F) [*Id.*];

3.      Hillcrest Farm II, LLC, 81 acres, located in Georgetown, Kentucky and subject to the Preliminary Order of Forfeiture dated June 17, 2009, ¶ (3)(G) [*Id.*];

4.      103 Blackberry Ridge Court located in Georgetown, Kentucky, held in the name of CWSJ, LLC, and subject to the Preliminary Order of Forfeiture dated June 17, 2009, ¶ (3)(J) [*Id.*];

5.      102 Dickinson Court located in Georgetown, Kentucky, held in the name of CWSJ, LLC, and subject to the Preliminary Order of Forfeiture dated June 17, 2009, ¶ (3)(K) [*Id.*]; and

6.      369 West Vine Street, Lexington, Kentucky, held in the name of CWSJ, LLC, and subject to the Preliminary Order of Forfeiture dated June 17, 2009, ¶ (3)(L) [*Id.*].

The articles of incorporation of CWSJ, LLC were filed with the Kentucky Secretary of State on January 9, 2002, with Defendant Shirley Cunningham listed as the sole member of the company. That entity purchased the Blackberry Ridge property approximately two weeks later (on January 23, 2002). On July 11, 2004, Shirley Cunningham transferred two additional properties – the 102 Dickinson Court property and the 369 Vine Street property – to CWSJ, LLC.

The articles of incorporation of Hillcrest Farm I, LLC, were filed with the Kentucky Secretary of State on August 29, 2003. Again, Shirley Cunningham was listed as the sole member of the company. On the date these articles of incorporation were filed, Shirley Cunningham transferred 53 acres of the farm into the corporate entity. An additional 28

acres of the farm was purchased by the corporate entity on February 9, 2005, with Shirley Cunningham signing the deed as the sole member of the entity.

The remaining property subject to Patricia Cunningham's claims is held in the name of Hillcrest Farm, II, LLC. This entity was formed on or about September 2, 2003. Again, Shirley Cunningham was listed as the sole member of the entity. By deed dated September 1, 2003, Defendant Cunningham transferred 81 acres of the farm to the corporate entity. The records of the Kentucky Secretary of State do not reflect that Patricia Cunningham was associated with any of the three corporate entities until October 2008.

Patricia Cunningham's claims to the above-described six properties are based on assertions that she was made the sole member of the corporate entities holding these properties through an amendment to a prenuptial agreement entered into in June 2004 between Shirley and Patricia Cunningham. The United States contests Patricia Cunningham's claims with respect to all six properties. It asserts that her claims should be stricken because Ms. Cunningham did not have a valid interest in any of the properties at the time the United States' interest in those properties vested. Further, it contends that Ms. Cunningham is not a bona fide purchaser for value who, at the time of the purchase, was without cause to believe that the properties were subject to forfeiture. [Record No. 1221]

Patricia Cunningham married Defendant Shirley Cunningham on July 14, 2004. Prior to this marriage, Ms. Cunningham was married to Vernon McNeal for seventeen years. Her marriage to Mr. McNeal ended in divorce on September 18, 2001. As a result of the divorce decree entered on that date, Ms. Cunningham owned various assets consisting of real estate,

an automobile, stock, bank accounts, and retirement funds. [*See* 5/24/10 Transcript at Record No. 1246; hereafter "Tr." at pp. 17-20]

Patricia Cunningham testified during the May 24, 2010, ancillary hearing and offered a number of exhibits in support of her claim relating to some of the real property subject to forfeiture.[4]  Likewise, the United States offered a number of exhibits during her testimony. These exhibits were marked and introduced for purposes of the ancillary hearing as Patricia Cunningham Exhibits Nos. 1 through 9 and United States Exhibits A through C.  These exhibits include: Ms. Cunningham's final decree of divorce from McNeal (P. Cunningham Exhibit No. 1); an agreement with Mr. McNeal regarding distribution of property (P. Cunningham Exhibit No. 2); a Tennessee court document captioned "Qualified Domestic Relations Order" (P. Cunningham Exhibit No. 3); a print-out of holdings by Ms. Cunningham's financial advisor (P. Cunningham Exhibit No. 5); a document reflecting the sale of certain real estate described as the "713 Jones Parkway" property (P. Cunningham Exhibit No. 6); a prenuptial agreement dated April 14, 2004, prepared by attorney Mary Meade McKenzie (P. Cunningham Exhibit No. 7);  an amended prenuptial agreement dated June 14, 2004, also prepared by McKenzie; and certified corporate documents from the Kentucky Secretary of State's office pertaining to several entities in which Defendant

---

[4]One of Defendant Cunningham's trial attorneys, David Davidson, represented Patricia Cunningham during the ancillary hearing. Ms. Cunningham's direct testimony essentially consisted of responses to leading questions by attorney Davidson. Based on Ms. Cunningham's demeanor and responses to questions from counsel and from the Court, the undersigned did not find her to be a credible witness.  Significant portions of her testimony will be summarized below.

-11-

Cunningham owned, operated and/or controlled and designated "Hillcrest Farm I, LLC"; "Hillcrest Farm II, LLC" and "CWSJ, LLC" (United States Exhibits A through C).

Although Ms. Cunningham had known Shirley Cunningham for a number of years, they did not become romantically involved until sometime after her divorce in late September 2001. [Tr., p. 17-18] By this date, Ms. Cunningham had acquired significant assets which were described during the ancillary hearing as including: real estate located in Brentwood, Tennessee (the 713 Jones Parkway property), a 1995 Cadillac Seville automobile; a retirement account valued at approximately $77,000; Kroger stock valued in excess of $31,000; liquidated stock options valued at approximately $107,000; Safeway stock; Wal-Mart stock from a brokerage account valued at approximately $31,000; a money market account with SunTrust Bank containing $121,000; a checking account with SunTrust Bank containing approximately $5,800; a retirement account with the Nashville Public Schools valued at approximately $12,000; a TIAA/CREF retirement account valued at approximately $3,700; interest in a partnership valued at approximately $75,000; interest in a Wal-Mart retirement account valued at approximately $488,000.[5] Ms. Cunningham was also employed by the Nashville Public Schools, earning an annual salary of approximately $80,000. [P. Cunningham Exhibit No. 4] According to Ms. Cunningham, she entered into her relationship with Shirley Cunningham "with her eyes wide open" which included a discussion of how the

---

[5]The assets which are listed by the Court but which were not mentioned during the May 24th hearing are described more fully in Ms. Cunningham's Marital Dissolution Agreement and Qualified Domestic Relations Order. *See* P. Cunningham Exhibit Nos. 2 & 3.

couple would manage their finances after they were married.  Ms. Cunningham testified that
this conversation occurred as early as 2003.  [Tr., p. 23-24]

Although Ms. Cunningham indicated during the May 24, 2010, hearing that both she
and Shirley Cunningham were aware that each held some assets, she testified that she did not
specifically ask him about what assets he had.  Likewise, Shirley Cunningham did not ask
about her assets.  [Tr., p. 26]  At some point, the parties discussed entering into a prenuptial
agreement which was prepared by attorney Mary Meade McKenzie in Kentucky.  The initial
agreement is dated April 14, 2004 – several months before the Cunninghams were married.
This document was introduced during the May 24, 2010, hearing.[6]

The April 14, 2004, Prenuptial Agreement contains a number of provisions relevant
to the issues presently before the Court.  This includes a paragraph (consistent with Patricia
Cunningham's testimony) that the purpose of the agreement was to provide that each party
would be able to keep separate his and her respective real and personal property owned at the
time of marriage.  [P. Cunningham Exhibit No. 7, p. 1]  Next, Article I of the agreement
provides for the specific disclosure of assets.  It states:

## ARTICLE I.

## Disclosure of Assets

---

[6]The April 14, 2004, Prenuptial Agreement contains a choice of law provision in Article XIII
designating Florida law as controlling.  The relevant paragraph provides that, at the time the
agreement was executed, both parties were domiciled in Florida.  [P. Cunningham Exhibit No. 7,
p. 11]  Based on the notary signature and seal on the last page of the document, it appears that the
April 14, 2004, Prenuptial Agreement was signed by the Cunninghams and two witnesses in Florida.

    A.    **<u>Shirley's Disclosure.</u>** Patricia acknowledges and agrees that she has examined the schedule of Shirley's assets set forth on Exhibit "A," attached hereto and made a part hereof by reference, that she understands such, that she has given consideration to these facts, and that she is entering into this Agreement freely and voluntarily and with a full understanding of its provisions, including the attached Exhibit "A" which is incorporated herein by reference.

    B.    **<u>Patricia's Disclosure.</u>** Shirley acknowledges and agrees that he has examined the schedule of Patricia's assets set forth on Exhibit "B" attached hereto and made a part hereof by reference, that he understands such, that he has given consideration to these facts, and that he is entering into this Agreement freely and voluntarily and with a full understanding of its provisions, including the attached Exhibit "B" which is incorporated herein by reference.

[P. Cunningham Exhibit No. 7., pp. 1-2]

In Article III of the agreement, the parties again reiterate their intention that their pre-marital property should remain separate. This article also purports to set forth their intentions regarding joint business ventures and jointly-acquired property. More specifically, paragraphs C. and D. to this article provide:

    C.    **<u>Joint Property.</u>** The parties may, during the marriage, acquire property in their joint names, with or without rights of survivorship, and such property is herein defined as "joint property."

    D.    **<u>Joint Business Ventures.</u>** The parties acknowledge that they have and may continue to enter into business ventures with each party contributing his or her separate property in exchange for his or her respective interest in and to such business ventures. The parties hereby agree that his and her respective interest in and to any such business venture and any and all rights of any nature or description that he or she may have or hereafter acquire as husband and wife in regards to such respective interest shall be governed by the written agreement between the parties executed in connection with establishing such business venture which establishes the rights of the parties in regards to such business venture. The parties hereby agree that his or her respective interest in and to any such business venture shall remain the

-14-

separate property of the parties, even if the parties do not set forth their respective interests in and to and agreements regarding such business venture in a separate written agreement.

[P. Cunningham Exhibit No. 7, p. 6]

It is noteworthy, however, that two documents referenced in the April 14th prenuptial agreement were not introduced during the ancillary hearing. Likewise, they were not produced by Ms. Cunningham in discovery following the filing of her claim. These documents are described in the agreement as the premarital assets of Patricia Cunningham (Exhibit A) and Shirley Cunningham (Exhibit B). On cross-examination, Ms. Cunningham testified as follows regarding the missing documents:

> Q. The amendment to the prenuptial agreement – Well, let's back up. The original prenup referenced two exhibits, Exhibit A was a statement of Shirley's assets, Exhibit B was a statement of your assets. Do you know what was on those exhibits?
>
> A. I don't recall what was on those. I don't recall even if I looked at those exhibits.
>
> Q. Do you know whether they exist as you sit here today?
>
> A. I believe they do, but I don't know for sure.

[Tr., p. 43]

During this line of questioning, counsel for the United States also pointed out that Ms. Cunningham had been asked to bring these documents to her deposition but had failed to do

-15-

so.[7]    Following counsel's initial questioning, the Court also asked about the missing

documents and received the following response from Ms. Cunningham:

> Q.    Now, the original prenup makes reference to Exhibits A and B, the listing of assets.  And as you testify here today, are you able to state with any degree of certainty that you have ever seen Exhibit A or Exhibit B to that prenup?
>
> A.    No.

[Tr., p. 51]

It is also noteworthy that, *prior* to the ancillary hearing, David Davidson, the attorney

representing Shirley *and* Patricia Cunningham, represented to the Assistant United States

Attorney that the exhibits to the April 14, 2004, prenuptial agreement could not be found and,

in fact, were never made a part of the document.  By letter dated January 21, 2010, Mr.

Davidson made the following representations:

>  . . . as to the attachments to the Prenuptial Agreement, I can tell you that an effort has been made to obtain attachments and none have been found. Although you certainly may ask Ms. Cunningham about attachments, she has represented to me that she does not have attachments to the agreement and never did have attachments.  I asked counsel for Ms. Cunningham for copies of attachments and I was told that there are none that were made part of the agreement.

[*See* Record No. 1221, attached Exhibit C.]

---

[7]One could infer that the missing documents are not really misplaced but have not been produced because they contain information that neither Ms. Cunningham or Shirley Cunningham wants the United States to discover; that is, the identity of assets which could be subject to forfeiture in this action or attachment in the civil actions filed by other judgment creditors.  The Court need not resolve that question at this time.  Because Ms. Cunningham has not met her burden of establishing an interest in property subject to forfeiture, her claim fails.

In light of Ms. Cunningham's concessions, on re-direct examination, her attorney attempted to establish that, while Exhibits A and B to the Prenuptial Agreement might not have been attached to the document or reviewed by the parties at the time of signing, both Mr. and Ms. Cunningham had the "opportunity" to ask the other about his and her assets. [Tr., pp. 52-53]

Counsel for Patricia Cunningham also introduced a document captioned "Amendment to Prenuptial Agreement" during the May 24, 2010, ancillary hearing. [P. Cunningham Exhibit No. 8] This exhibit is dated June 14, 2004, and signed by both Patricia Cunningham and Defendant Shirley Cunningham. However, unlike the original Prenuptial Agreement, the document does not contain witness signatures and the parties' signatures are not notarized. Patricia Cunningham asserts that, based on this document, she became the owner of Hillcrest Farms on or about July 14, 2005. This assertion is based on the following provision of the amendment which provides that:

### ITEM I.

Pursuant to paragraph C of Article XIII of the Agreement, the parties may modify the Agreement so long as such as modification is set forth in writing and signed by both parties. The parties hereby modify Article IX of the Agreement titled for identification purposed [sic] only as ***Transfers Between Parties*** and add a second unnumbered paragraph to such Article that shall follow the paragraph currently set forth in such Article. Such adding paragraph is set forth as follows:

On the date that the parties are married for one (1) year or the 1st day of January, 2006, whichever date occurs first, Shirley shall transfer to Patricia any and all interest that he may own in **Hillcrest Farm I, LLC,** a Kentucky limited liability company, **Hillcrest Farm II, LLC,** a Kentucky limited liability company,

-17-

and **CWSJ, LLC,** a Kentucky limited liability company, (the "LLCs") and shall execute any and all documentation necessary to transfer ownership and control of such LLCs to Patricia. Notwithstanding the foregoing sentence, Patricia may name Shirley as a manager of either of such LLCs and/or may designate Shirley as an officer of either of such LLCs, but shall not be required to do so and has not hereby agreed to do so. Such LLCs interests shall thereafter become the Separate Property of Patricia, as defined herein, and such property shall hereinafter be governed in all aspects by the terms of this Agreement.

[P. Cunningham Exhibit No. 8]

During the ancillary hearing, Patricia Cunningham explained that this amendment was intended to "protect her investment" in Hillcrest Farm and provide her with something more concrete than "lifetime rights." [Tr., p. 34-35] However, during her earlier deposition, Ms. Cunningham gave a different explanation, stating that the amendment was needed in the event something happened which would prevent her husband from taking care of her. The following deposition testimony is taken from the United States' motion to strike Cunningham's claim:

[Hillcrest Farms – three parcels]

Q.    It's vacant okay.  Now, you state that you're the owner of this property. How long have you owned it?

A.    I don't remember the exact date.  I don't know.

Q.    Give me – after you married?

A.    Yeah, after, yeah.  Through the Pre-Nup.

Q.    Through the Prenuptial Agreement?

-18-

A.    Yes.

Q.    Well, so you may have answered this, but what are the circumstances of your ownership?  I mean, how did you come to own the property?

A.    Well, it was the understanding, as I understood, the Pre-Nup, was that if anything happened, then it would be transferred to me and that's what happened.

Q.    So by anything happened, what do you mean?

A.    My understanding of the Pre-Nup is for whatever reason that Shirley wouldn't be able to take care of me or that I would need to – if he died or if we got divorced, or if he was no longer able to [take] care of me, then it would be titled to me.

Q.    When – so you're saying at the point at which Shirley was confined – was incarcerated – that meant that you established ownership over it because he could no longer take care of you or I'm just trying to understand what?

A.    Yeah.  That was my understanding.

*    *    *

[Blackberry Ridge Court, 102 Dickinson Court and 369 West Vine properties]

Q.    Okay.  At what point did you acquire this property?

A.    I don't know the exact date.

Q.    Okay.  What are the circumstances for your acquisition?

A.    Because it's all – everything in CWSJ is what was in the Pre-Nup.

Q.    So it's the same –

A.    Same –

Q.    I don't want to – it's the same claim that you're making –

A.    Yes.

-19-

Q.      – with regard to Hillcrest?

A.      Yes.

Q.      Okay.  All based on the Pre-Nup –

A.      Right.

[Record No. 121, p. 8]  Although Ms. Cunningham eventually became the only member of the corporate entity CWSJ, LLC, she was unable to recall at the time of her deposition or at the time of the ancillary hearing the approximate date on which she became the sole member. [*Id.*, pp. 8-9]

The Cunninghams also purported to amend the operating agreement for Hillcrest Farm II, LLC on or about January 1, 2006, to provide for the transfer all "Financial Units" of the entity from Shirley to Patricia Cunningham.    [P. Cunningham Exhibit No. 9] Notwithstanding the alleged transfer of ownership in mid-2005 or early 2006, Shirley Cunningham continued to execute documents on behalf of Hillcrest Farm II, LLC as late as February 2008 while claiming to be its Manager.[8]  [*See* United States Exhibit D.]

According to the testimony presented during the May 24, 2010, ancillary hearing, more than $1,000,000 in repairs and improvements were made to Hillcrest Farm over the course of several years.  [Tr., p. 45]  However, Patricia Cunningham was uncertain, at best,

---

[8]The Cunninghams did not amend the articles of incorporation filed with the Kentucky Secretary of State concerning any alleged transfer of ownership of Hillcrest Farm I, LLC, Hillcrest Farm II, LLC, or CWSJ, LLC.  [*See* United States Exhibits A, B and C.]  However, no authority has been provided that such is necessary to accomplish such a transfer under Kentucky law.

with respect to her contribution to these repairs and improvements.[9]  In response to questions from the United States, Cunningham testified that she did not provide documentation of any of the money she spent because she simply does not have time to respond to the government's request for this information.

> Q.    Now, extensive work and repairs were done at Hillcrest Farms, more than $1 million, would you agree?
>
> A.    Over the course of years, I would think so.
>
> Q.    You're not claiming that any of that money used for those renovations came from you, are you?
>
> A.    I don't know specifically which ones you're talking about.  Which ones are you talking about?
>
> Q.    Well, extensive renovations to the tune of over $1 million.
>
> A.    I did not spend $1 million renovating.
>
> Q.    That was Shirley's money, wasn't it?
>
> A.    I don't know.
>
> Q.    Now, when we had the deposition earlier, you were asked to provide records evidencing your ownership of properties and your money spent. Do you remember that?
>
> A.    If you say so.

---

[9]Through a series of leading questions presented to Patricia Cunningham during her direct examination, testimony was presented that she and her husband intended to develop Hillcrest Farm into a thoroughbred breeding operation and also add vineyards and other businesses on the property. [Tr., pp. 29-31] It does not appear that the property developed to the extent originally envisioned.

-21-

> Q.    No, I don't want to say so.  I'm just asking, we asked you to provide any evidence of monies you spent on the Hillcrest Farm property or the properties owned by CWSJ.  Do you recall that?
>
> A.    If it was in there, then, yes, I don't disagree with that.
>
> Q.    So you stated today that you had spent some money on these ventures.
>
> A.    I have.
>
> Q.    Why didn't you provide bank records to the United States to that effect?
>
> A.    Because I don't have time.  I don't pull together all that stuff to – everything that's been asked of me to do and  – but I have spent a lot of money on Hillcrest Farm.

[Tr., p. 45-46]  After Patricia Cunningham's flippant responses to questions posed by the United States, the Court conducted follow-up questioning about the money this claimant allegedly spent on improvements at Hillcrest Farm.

> Q.    Ms. Cunningham, in response to Mr. Davidson's questions, you had indicated that you had invested time, money, [and] effort into Hillcrest Farm?
>
> A.    Yes.
>
> Q.    But in response to the United States' questions, you said you just didn't have time to look for any receipts of any monies that you had invested; it that what you told the United States?
>
> A.    I couldn't get all of those records together.
>
> Q.    Well, you said that you didn't have time to do it.
>
> A.    Well, I really didn't.
>
> Q.    Well, did you look for records?

A.    I looked for some.

Q.    Did you find any records?

A.    I have check registers and –

Q.    But you didn't bring any of those with you today?

A.    I have nothing.

Q.    So there's been no documentation that's been entered into the record that indicates that you spent the first dollar on this property, is that correct, of your money?

A.    I don't know.

Q.    You don't know?

A.    I don't know.

[Tr., pp. 49-50]  Again, Ms. Cunningham's attorney attempted to rehabilitate her testimony on this point during re-direct examination.  However, the Court finds this testimony that she invested "some of her money" into Hillcrest Farm to be not credible.  [Tr., p. 55]

## III.    The United States' Motion to Dismiss Patricia Cunningham's Claims

The United States correctly asserts that a petition asserting a claim in property subject to forfeiture may be dismissed if the claimant fails to establish a prima facie claim of entitlement in the property.  *See United States v. Campos*, 859 F.2d 1233, 1240 (6th Cir. 1988).  Here, Ms. Cunningham has failed to establish that she had a vested right in the six items of property subject to her claim at the time of the commission of the acts giving rise to forfeiture.  21 U.S.C. § 853(n)(6)(A).

-23-

In short, the evidence demonstrates that, as of the time the Cunninghams were married in July 2004, Ms. Cunningham knew or should have know about the investigation involving claims that her husband and others had defrauded clients of millions of dollars. And while there is abundant evidence to support this conclusion, evidence that Ms. Cunningham invested any of her assets in improvements to Hillcrest Farms is lacking. Instead, the Court concludes that Defendant Cunningham used his resources (including fees taken from his former clients/victims) for the various purchases which followed the 2001 settlement. To the extent that the April 14, 2004, Prenuptial Agreement was amended to provide for Ms. Cunningham to receive these properties if something "happened" to her husband, the Court believes the contingency being contemplated was the discovery of Shirley Cunningham's fraudulent activities.[10]

---

[10]The Court also observes that the Prenuptial Agreement and the amendment to that agreement may be invalid. As noted by the United States in its supporting memorandum, there is some question whether Florida or Kentucky law governs the agreement. [Record No. 1221-1, p. 13 n.8] In Florida, the requirement of full disclosure of assets set forth in *Del Vecchio v. Del Vecchio*, 143 So. 2d 17 (Fla. 1962), has been superseded by statute with respect to probate proceedings but remains in effect for purposes of dissolution. *Weintraub v. Weintraub*, 417 So. 2d 629, 630-31 (Fla. 1982); *see* Fla. Stat. Ann. § 732.702(2) ("No disclosure [of each spouse's estate] shall be required for an agreement, contract, or waiver executed before marriage.") Likewise, under Kentucky law, to be enforceable, a prenuptial agreement requires full disclosure by the parties. *Edwardson v. Edwardson*, 798 S.W.2d 941, 945-46 (Ky. 1990) (To be enforceable, a prenuptial agreement is subject to several limitations which include full disclosure of property and income. In addition, the agreement must not be unconscionable and it may only apply to property disposition and maintenance.). Here, it is apparent that full disclosure is lacking based on the absence of Exhibits A and B to the original Prenuptial Agreement. At best, these exhibits which were necessary to provide full disclosure of the parties' assets were not prepared. At worst, the documents were prepared but are not being presented in an ongoing attempt to hide assets from Cunningham's judgment creditors. And while there are other reasons to explain the missing documents, in light of all the evidence presented, the Court does not give credence to other possible explanations. In any event, however, the questionable validity of these documents does not affect the Court's analysis under the forfeiture statute or its ultimate conclusion that Ms. Cunningham does not have a

Notwithstanding the above findings, the Court also agrees with the government that any interest Ms. Cunningham has in the subject properties did not vest before the government acquired its interest in the property. In connection with Ms. Cunningham's claim under 21 U.S.C. § 853(n)(6)(A), under the relation back doctrine, all right, title and interest in the property subject to forfeiture are deemed vested in the United States at the time of the commission of the acts giving rise to forfeiture. *United States v. Stowell*, 133 U.S. 1, 16-17 (1890). This doctrine also applies to substitute assets such as those identified in the Superseding Indictment. *United States v. McHan*, 345 F.3d 262, 272 (4th Cir. 2003) (concluding that "the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p) relates back to the date of the acts giving rise to the forfeiture under 21 U.S.C. § 853"); *see United States v. O'Brien*, 181 F.3d 105, 1999 WL 357755 (6th Cir. 1999) (Table) (assuming without deciding that a third party must assert that she had an interest in substitute assets at the time of the crime to make a claim under 21 U.S.C. § 853(n)(6)(A)). Here, the defendant's criminal conduct began as early as 2001. However, Ms. Cunningham does not contend that her interest in the subject property vested before January 1, 2006. Finally, because the Court concludes that Ms. Cunningham sought to obtain the subject property by means of a fraudulent transfer from her husband, she lacks standing to assert a claim to it. *See* Ky. Rev. Stat. Ann. § 378.010 (transfers "made with the intent to delay, hinder or defraud creditors, purchasers, or other persons" are void); *United States v. Real Property Located at 5208 Los*

---

legitimate claim to the property at issue.

*Franciscos Way*, 385 F.3d 1187, 1192 (9th Cir. 2004) (applying California's fraudulent-transfer statute to conclude that claimant lacked standing in forfeiture action).

Likewise, Ms. Cunningham has not demonstrated that she acquired a legal right, title or interest in the property from the defendant as a bona fide purchaser for value who was, at the time of the purchase, reasonably without cause to believe that the property was subject to forfeiture. 21 U.S.C. § 853(n)(6)(B). Under this statutory section, even if a claimant can establish an interest in property, she must show that she acquired the interest as a bona fide purchaser for value and that the interest was acquired at a time when the claimant was without reasonable cause to believe that the property was subject to forfeiture. *United States v. Timley*, 507 F.3d 1125, 1130-31 (8th Cir. 2007). A bona fide purchaser is one who gives something of value in exchange for the property and has no notice of any fraudulent intent on the part of the seller. *Chrisman v. Greer*, 39 S.W.2d 678, 679 (Ky. 1931). In other words, the transfer of property cannot be a fraudulent conveyance or a gift disguised as a business transaction. *See* Ky. Rev. Stat. Ann. § 378.010; *see also United States v. Frykholm*, 362 F.3d 413, 417 (7th Cir. 2004) (claimant was not a bona fide purchaser for value, and thus could not prevail under § 853(n)(6)(B), where transfer of property to claimant constituted a fraudulent conveyance under state law).

In the present case, there is no dispute that Defendant Cunningham spent considerable sums of money to purchase and improve the properties held by Hillcrest Farm I, LLC, Hillcrest Farm II, LLC, and CWSJ, LLC. Without adequate explanation, the Cunninghams sought to transfer ownership of these entities to Patricia Cunningham shortly before their

marriage in July 2004.  Contrary to her assertions, the Court does not find any reason to conclude that Ms. Cunningham invested any significant sum in the properties that are the subject of her claims either before or after her marriage to Shirley Cunningham.

Based on the foregoing analysis and discussion, the Court concludes that Patricia Cunningham has failed to establish a legitimate claim to any of the six properties identified in her petition under 21 U.S.C. §§ 853(n)(6)(A) or (B).  Accordingly, the United States motion [Record No. 1221] will be granted and Patricia Cunningham's claims [Record No. 889] will be stricken.

## IV.    The Claim of Melissa Green

Melissa Green was the live-in girlfriend of Defendant William Gallion at times relevant to this action.  On April 6, 2010, Green submitted a claim asserting that she is entitled to one lifetime breeding right in the thoroughbred stallion Einstein and that she has a legal right to one-third of all funds and real property associated with WJG Investments, LLC (Florida) that was forfeited from Defendant Gallion.  [Record No. 1206]  Green did not provide any accompanying documentation to support her claim.  Instead, she merely contended in her petition that, on January 31, 2009:

> the Petitioner was given a lifetime breeding right in the thoroughbred stallion, Einstein (BRZ), a seven year old dark bay or brown horse by Spend a Buck out of Gay Charm by Ghadeeer (FR), owned by Tandy LLC d/b/a Midnight Cry Stable.  The Petitioner and Patricia Cunningham each were assigned a breeding right as compensation after managing the racing career of Einstein to more than $2.5 million dollars [sic] in winnings though 2008 and 2009. Following his racing career, Einstein was sold as a breeding stallion for almost $2 million dollars [sic].

-27-

Furthermore, the Petitioner has a legal right to one-third (1/3) of all funds and property associated with WJG Investments, LLC (Florida), including but not limited to Tracts 1 and 2 of the property located at 21 Avenue of Champions, Nicholasville, Jessamine County, Kentucky, 40356, and the property located at 5873 Ware Road, Lexington and Paris, Kentucky, Fayette and Bourbon counties respectively. The Petitioner also has a legal right to one-third (1/3) of the funds being held in Account #XXXXXXX1220 at the Vanguard Group in the name of WJG Investments, LLC (Florida).

The Petitioner is currently in the process of obtaining documents regarding the Vanguard Group and WJG Investments, LLC (Florida), which can further assist this Court in establishing the Petitioner's legal right. These documents are in the custody and control of Hon. Angela Ford, Counsel for Mildred Abbot, et al., the Plaintiffs in the state court action currently before the Boone Circuit Court, No. 05-CI-436.

[Record No. 1206].[11]

On April 16, 2010, the United States moved the Court to strike Green's claim and provided support for its position. [Record No. 1213] Counsel for Green did not respond to the United States' motion. Notwithstanding this failure, the Court allowed testimony to be submitted during the May 24, 2010, ancillary hearing in connection with Green's claim. Melissa Green did not attend the hearing on May 24, 2010. However, her deposition was taken by the government in advance of the hearing. Relevant portions of this deposition have been attached to its motion to dismiss. Green's counsel called two witnesses during the ancillary hearing in support of her claims: Patricia Cunningham and Andre Regard.

---

[11]The documents attached to the United States' motion to dismiss this claim establish that the entity holding ownership to the real property subject to Green's claim is incorporated in Kentucky under the name "WJG Holding, LLC." [*See* Record No. 1212; attached deeds.]

According to Ms. Cunningham, Defendants Gallion and Shirley Cunningham were partners in a number of thoroughbred ventures including Tandy, LLC. This entity owned the thoroughbred Einstein and did business under the name of Midnight Cry Stables. Sometime during the spring of 2008, Defendants Gallion and Cunningham leased Einstein to Patricia Cunningham and Green. A copy of what was represented to be the lease agreement for this horse was introduced during the May 24, 2010, hearing as Green Exhibit 1. The document is dated April 1, 2008, contains a one-year term, and is signed by Shirley Cunningham, Patricia Cunningham, and Melissa Green. In light of the duplicate signature pages, it appears that Green did not sign the document at the time it was signed by Shirley and Patricia Cunningham. The fax information at the top of the third page of the exhibit also supports this conclusion.

Although the assets of Tandy, LLC were under the supervision of the Boone Circuit Court during 2008, the parties to the lease agreement did not advise that court of the agreement or seek its approval. [*Id.* at p. 117] Likewise, the parties did not notify the state court or seek its approval before Green and Cunningham were each conveyed a lifetime breeding right in Einstein by Defendants Gallion and Cunningham. This information was subsequently conveyed to the court in July or August of 2009. [*Id.* at p. 121]

Based on questions from Green's attorney, Patricia Cunningham testified that she and Green "took charge of the horse Einstein as lessee and managed his racing career from April for several months thereafter in 2008." [Tr., pp. 64-65] According to Ms. Cunningham, prior to this lease arrangement, there was no one involved in the ownership of the horse

-29-

licensed in Kentucky to race him.    [*Id.*]    Following this arrangement, Einstein was successfully raced in 2008 and 2009 and was nominated for an Eclipse Award in 2008.  [*Id.* at pp. 66-67]  Subsequently, Einstein was sold to another thoroughbred operation in Kentucky.

Ms. Cunningham testified that, as a result of her efforts and the efforts of Green to manage and race Einstein, each was given a lifetime breeding right in the stallion.  A copy of the document purporting to transfer this interest to Ms. Cunningham and Green was admitted during the May 24, 2010, hearing as Green Exhibit 2.  This agreement is dated January 31, 2009.[12]  In addition to lifetime breeding rights, the document further provides, that, in the event the horse was sold, Green and Ms. Cunningham would be entitled to $2.5% of the sale price.

On cross-examination, Ms. Cunningham offered the following explanation for the transaction involving Einstein:

> Q.    Ms. Cunningham, what were the circumstances of this January 2009 assignment and transfer document?  Tell me how that came about.
>
> A.    I don't know specifically how this came about.  What I can tell you is that in the horse racing business, people who have an active role in a good racehorse  who becomes a stallion and people who helped in the development of that horse, no matter when it is, are often awarded seasons to horses.[13]  And so this agreement – and I don't know why and

---

[12]As noted previously, the second criminal trial which ended in Defendant Cunningham and Gallion's convictions began approximately two weeks after this assignment.

[13]Generally, a "season" entitles the owner to *one* breeding to a stallion.  This may be accomplished by sending a mare to the stallion or by a sharing agreement.  However, a lifetime breeding right entitles the owner to one breeding during *each* season of the stallion's breeding

the timing.  But this agreement was intended to reward those people who helped get the horse to that point.  That's what I know.

Q.    So because of work that was done in 2008, Mr. Gallion and Mr. Cunningham decided in January 2009 to give away these breeding rights; correct?

A.    Because of work that was done all along as it related to Einstein.  They thought, I guess – I don't know what they thought.  But it's customary in the horse industry that people who have significant involvement in getting a horse to the level of Einstein are rewarded, and generally through seasons.

[*Id.*, at pp. 68-69]

In response to questions from the Court, Ms. Cunningham explained the work performed by Green in connection with Einstein.  According to Ms. Cunningham, Green:

A.    . . . allowed Einstein to achieve at least two more Grade 1 races.  She allowed Einstein to at least be nominated for the Eclipse Award and Older Horse of the Year and Turf Horse of the Year.  If we would not be able to lease Einstein, Einstein's career would have stopped at a point that he would have relatively little, if any, value as a stallion.

Q.    So what did she do?  You say she allowed the horse to achieve these various matters.  What did she do?

A.    She leased it.  She agreed to be a lessee that allowed him to race beyond that one allowance race in Florida.

Q.    All right.  Now, you said that you were also a lessee; correct?

A.    Yes.

---

career.  [*Id.* p. 137]  Likewise, it is important to note the number of annual breedings are limited for a variety of reasons, not the least of which is to maintain the value of those holding ownership interests in the horse.

Q.    What did Ms. Green do that you either did not do or could not do in licensing in Kentucky?

A.    I don't know, other than I don't know if the partnership would have agreed to allow me to do it by myself.

Q.    Well, I'm only asking you what you know.

A.    I don't know.

Q.    You don't know of anything that she did that you couldn't have done to allow the horse to race; is that accurate?

A.    I don't know for sure.

[*Id.* at pp. 71-72][14]

Following Ms. Cunningham's testimony, Andre F. Regard was called as a witness supporting Green's claim. Regard is a practicing attorney and a principal in Cognac, LLC, doing business as Occidental Thoroughbreds, a bloodstock advisory business. At times relevant to this action, Regard was retained by Defendants Cunningham and Gallion to represent Tandy, LLC in connection with matters pending in the Boone Circuit Court action. Regard denies that he has ever represented Defendants Cunningham or Gallion.[15] However,

_____

[14]At the conclusion of Ms. Cunningham's testimony in connection with the claim of Melissa Green, counsel for Ms. Cunningham orally requested to include a claim for 2.5% of the sale price of Einstein. This motion was denied as untimely pursuant to 21 U.S.C. § 853(n)(2). [Tr., p. 74]

[15]Despite his denials of individual representation of the defendants, Regard testified on re-direct examination that, "to the extent I ever represented Mr. Gallion and Mr. Cunningham individually, it was in that action [before Judge Crittenden] as we perceived to be a shareholders' derivative action." [Tr., p. 95]

On August 12, 2010, Regard removed three separate state court actions to this Court. In the action styled *Abbott et al., v. Cunningham, et al.*, U.S. Dist. Ct., E.D. Ky., Central Div. at Lexington, No. 5: 10-280-DCR, Regard filed a Notice of Removal from the Fayette Circuit Court on behalf of

his firm also represents Gayle Garrison in connection with a claim asserted in this forfeiture action. In essence, Garrison's claim is against the assets of Tandy LLC. Additionally, one witness with thorough knowledge of the state court proceedings testified that, on one or two occasions, Regard filed documents that were "arguably" contrary to Tandy, LLC's or the receiver's position. [*Id.*, p. 127] The state court receiver also expressed concerns about Regard's representation of Tandy, LLC during the fall of 2008 while the receiver was attempting to determine the value of Curlin without "tipping off the market." [*Id.*] In fact, as a result of Regard's actions which were viewed contrary to the best interests of Tandy, the receiver refused to approve his application for payment.

> A.    . . . I do recall that there was about $9,600 which was incurred in the fall of 2008 which we did not approve, because those were the actions taken by Mr. Regard that seemed to be contrary to what Tandy's management in pursuing this move to both figure out the value of Curlin and ultimately recommend a potential sale of the 20 percent interest was worth, and at that point – and that would have been in November of 2008 – it was clear that Mr. Regard was filing documents against Tandy or against the receiver certainly in order to prevent that action from taking place. And to that extent, those $9,600 worth of bills we did not approve and Mr. Regard took them off the bill.

---

Defendants Shirley A. Cunningham, Jr. and CWSJ, LLC, a/k/a Shirley Cunningham, Jr. In the action styled *Abbott, et al., v. William Gallion, et al.*, U.S. Dist. Ct., E.D. Ky., Central Div. at Lexington, No. 5: 10-282-DCR, Regard filed a Notice of Removal from the Jessamine Circuit Court on behalf of Defendants William J. Gallion and WJG Holdings, LLC. Finally, in the action styled *Abbott, et al., v. Cunningham. et al.*, U.S. Dist. Ct., E.D. Ky., Central Div. at Lexington, No. 5: 10-285-DCR, Regard filed a Notice of Removal from the Fayette Circuit Court on behalf of Defendant Shirley A. Cunningham, Jr. and Shirley A. Cunningham Jr. Family Foundation, Inc. Thus, to the extent that questions have been raised regarding Regard's client loyalties, his actions in these three cases eliminate any pretense that he is not representing the individual interests of Defendants Gallion and Cunningham.

[*Id.* at p. 128]

According to Regard, the April 2008 lease agreement upon which Green's claim is based was brought about as a result of a charging order entered in the state action in November 2007 and concerning distributions from Tandy. [*Id.* at pp. 77-78] It appears that, during the fall and winter, most of the focus concerned whether the thoroughbred Curlin would be sold and, if sold, who would receive the proceeds of sale and the Breeders' Cup earnings from 2007.

Regard testified that, prior to the Defendants entering into the lease agreement with Green and Ms. Cunningham, Einstein has raced successfully. Following an injury, the horse again raced well in January 2008. Because thoroughbred racing was shifting toward Kentucky at that time of the year, a decision was made to race Einstein in the Woodford Reserve. However, Gallion and Cunningham were unable to renew their licenses to race the horse in the Commonwealth. Therefore, the lease arrangement circumvented this licensing problem.[16]

In July 2008, the judge presiding in the Boone Circuit Court action determined that Einstein should not be raced in the name of Ms. Cunningham and Green. Instead, the horse was raced in the name of the interim receiver. [*Id.* at p. 85] As a result of this action, Einstein raced initially under the "management" of Ms. Cunningham and Green for approximately three months. It appears that later in 2008, some management decisions

---

[16]Regard testified that he drafted the lease agreement introduced as Green Exhibit No. 1.

-34-

returned to Defendants Gallion and Cunningham. [*Id.* at p. 96] However, Regard testified that, the interim receiver "deferred practically all decision to Ms. Cunningham and Ms. Green and Mr. Gallion and Mr. Cunningham." [*Id.* at pp. 87-88] If accepted, this testimony highlights the fact that, while Green and Ms. Cunningham were making official decisions pertaining to Einstein, the actual decisions were being made behind the scenes by the defendants. This conclusion is bolstered by Regard's testimony on re-direct examination. According to Regard, as of January 2009, Defendants Cunningham and Gallion had resumed active management of Tandy, LLC. This included critical decisions such as where to race Einstein. [*Id.* at 96-97]

The Order entered July 2, 2008, in the Boone Circuit Court action is also noteworthy with respect to efforts undertaken by the Defendants, Green and Ms. Cunningham to violate prior directions of that court. In relevant part, Judge Crittenden notes that:

> This Court reviewed Plaintiffs' motion and allegations that income to Tandy, LLC, has not been paid to the Interim Receiver in accord with this Court's previous Orders. The Court confirmed this allegation with Counsel for the Interim Receiver. This Court has previously been informed that the lease arrangement between Tandy and Patricia Cunningham and Melissa Green for the 20% interest that Tandy holds in the horse, Curlin, and the 100% interest Tandy holds in the horse, Einstein, was for racing purposes only. However, it appears that Ms. Cunningham and Ms. Green have received sums as a result of race participation by both Curlin and Einstein. Those sums have not been turned over to the Interim Receiver while Counsel for Tandy requests the Interim Receiver to continue to pay Tandy Bills.

> This Court has also previously announced its opinion that Tandy, LLC, and other wholly-owned entities of Defendants Shirley Cunningham and William Gallion are alter ego entitles of the Defendants and subject to attachment by the Plaintiffs. This Court has yet to decide what form that attachment will take

-35-

in order to maximize the value of the entities for the benefit of the Defendants and the Plaintiffs.

It now appears that the decisions being made in the management of Tandy, LLC are not conforming to at least the spirit of prior Court orders and may be in direct violation of those Orders. It also appears that the management decisions of Tandy, LLC are not being made to benefit the organization but may actually diminish the value of the LLC.

[Green Exhibit No. 6]   Regard strongly disagrees with the factual basis for Judge Crittenden's July 2, 2008 Order. [*Id.*]

Regard also explained his understanding of the reason that lifetime breeding rights in Einstein were given to several individuals, including Green, in January 2009. According to Regard, at this time, the decision was made to sell Einstein. Gallion and Cunningham then decided to "reward all of the individuals who had participated in the success" of the thoroughbred. [*Id*. at p. 99] However, there is no indication there was any contractual or other obligation to do so. And because Regard disagreed with Judge Crittenden's rulings in the Boone Circuit Court action, he apparently believed there was no requirement that he advise that court of the Defendants' actions in attempting to give away these lifetime breeding rights.

On cross-examination, Regard was questioned regarding his involvement in litigation matters in which default judgments were entered in various state court actions. [*Id.* at pp. 92-93] While Regard attempted to explain that he was following the instructions of the receiver of Tandy, LLC, it is clear that he is not a disinterested witness offering unbiased testimony.

-36-

Further, his animosity toward counsel for the government was striking during the May 24, 2010, ancillary hearing.

Counsel for Green also called Sylvius Von Saucken as a witness in support of her claim. At times relevant to this proceeding, either Mr. Von Saucken or his partner, Matt Garretson, have held the position of court-appointed receiver or interim receiver in the state court action pending in the Boone Circuit Court. Von Saucken described the initial duty of the receiver as attending to the sale of the thoroughbred Curlin and certain management obligations in connection with Tandy, LLC. [*Id.* at pp. 104-05, 114-15] These management obligations included reviewing expenses submitted for payment and making recommendations to the state court concerning approval of such payments. However, it did not include making decisions regarding breeding or matings of the mares owned by Tandy, LLC. Likewise, the receiver did not determine when or where the various thoroughbreds would race. According to Von Saucken, "the receiver was to receive certain expense items from Tandy, review them to determine if they were ordinary and reasonable expenses within a business context and then approve the payment of them, either through court order or through a request for a court order." [*Id.* at p. 105]

Von Saucken testified that the receiver's role was expanded due to circumstances occurring between November 20, 2007, and July 2, 2008, when the state court became concerned with the Defendants' attempts to confer either direct or indirect benefits to family members. Von Saucken described this circumstance as the attempted assignment of Einstein's racing rights to Patricia Cunningham and Green. [*Id.* at p. 106] However, no

-37-

moneys were improperly transferred to either Ms. Cunningham or Green from any of the Tandy thoroughbreds during this period.  Von Saucken also confirmed that toward the end of 2008, "operational control" of the management and affairs of Tandy reverted back to Defendants Cunningham and Gallion.  This did not include the ability to transfer title to any of the assets.  Instead, it pertained to paying bills and racing horses.  [*Id.* at p. 108][17]

When questioned about the ability of Tandy to run horses in claiming races, Von Saucken testified that, while court approval was not required for such actions, the receiver "did obtain [state] court approval every time we sold a horse or every time we affected a breeding interest" after full management authority was returned to the receiver in April 2009. [*Id.* at p. 111]  However, prior to that time, management of Tandy did not seek or obtain such approval.

On cross-examination, Von Saucken provided further details regarding the nature of the state court receivership and well as the concerns giving rise to the court's actions following execution of the lease agreement in favor of Green and Patricia Cunningham.

> The concern, however, was it [the lease agreement] was done without the interim receiver's knowledge and without the Court's knowledge.  And the Court was concerned about that, concerned about one of the primary reasons for this receivership to exist in the first place, because this wasn't your typical receivership.  It might not have been a statutory receivership, but it wasn't a receivership to address the insolvency of a corporation, for example, it was actually a receivership that is more akin to an attachment or potentially a writ

---

[17]Von Saucken testified that the state court continued to have problems with Defendants Gallion and Cunningham's management actions after the return of operational control to them.  For example, in April 2009, a problem developed with Tandy being unable to receive the race proceeds from the San Anita Stakes.  On April 13, 2009, the state court returned "full management control" to the receiver.  Liquidation of the assets commenced in August 2009. [*Id.* at p. 111]

of possession, and that the Court was trying to possess the assets so they didn't get improperly distributed. And I think that that's – I know that's what the Judge was most concerned about, was between the time of November 20th of 2007 and July 2nd of 2008, leaving the receivership in the position of approving expenses after the fact. And not giving the receiver further management duties ran the risk of finding out about something after the fact. And even though it's true that there was no benefit that was conferred on to Melissa Green and Patricia Cunningham, the concern was that that happened without the Court's approval in advance without the receiver's knowledge.

[*Id*. at pp. 117-18]

Viewed from hindsight, it is now clear that the defendants, assisted by Green and Ms. Cunningham, were attempting to accomplish exactly what the state court was attempting to prevent: dissipation of assets of Tandy, LLC. Through the lease arrangement, Green claims to have assumed "management responsibilities" for Einstein, even though she has not presented one bit of evidence explaining what she did in this role. And now having claimed that she performed these duties, she seeks to be reimbursed from the assets of the company.

According to Von Saucken, neither the receiver nor the state court with control of Tandy, LLC assets was aware of the defendants' attempt to convey lifetime breeding rights in Einstein to Green and Ms. Cunningham until the time that the receiver was selling Einstein. When contacted in either July or August of 2009 (or possibly as late as October 2009), Regard informed Von Saucken that he was unaware of any documentation conveying such rights to Green and Ms. Cunningham.

> Q.    So the issue of a proposed breeding right for Ms. Green came up during contract negotiations with the sale of Einstein, but this particular document, is it possible that you didn't see this document until an October filing by Mr. Regard on behalf of Gale Garrison?

-39-

A.      That is possible.  As a matter of fact, that's probable, because I believe Mr. Regard had filed something under seal in the Boone County Circuit Court and he had provided proof of Mr. Garrison's rights to a breeding right or a percentage of the sale of Einstein.

Q.      So in essence, you and the Court didn't see this document until after Einstein was sold?

A.      That's correct.  We were aware that there may have been a breeding right, but we were not provided any written right evidencing that breeding right.  Had we been provided this document, we would not have – we would not have written in the breeding right to the purchase agreement for Einstein because we weren't involved in this assignment and transfer.

Q.      Was it surprising to you when you received this document for the first time?

A.      It was surprising to us that at the very least we didn't have a copy of it by April 13th, 2009, when the Court clarified that all management decisions and all future transactions were to go through the receiver's office.

Q.      And before that – That's kind of an evolution timeline of your receivership.  Before the April order reinstituting you as all management decisions should be made, could a document like this be entered into just based off of Shirley Cunningham and Bill Gallion without Court approval?

A.      In my opinion, no.  I mean, the concern is this document transfers an interest.  It's not the same as deciding where a horse is going to run or what vendors should be paid, but this transfers an ownership interest in an asset of Tandy's without Court approval or without at least the receiver's ratification.

Q.      So along the same lines, let's say in January 2009 that Mr. Gallion and Mr. Cunningham had decided that Ms. Green had done significant work for them related to other horses.  In your opinion, could they have transferred – you know, we think your work is worth $20,000, so we're going to pay you for that work.  Could they have transferred that out of

-40-

> Tandy's bank accounts for payment for work done by Ms. Green without Court approval?
>
> A.    I don't believe so, but that's because the recipient is as important as the transfer. You know, we are actively – I'm still an active receiver for the state court proceeding until we file our final report and are discharged by the Court. We still have certain responsibilities. And even though there was a state court order ordering the receiver to wind up its affairs, it's significant to note that it wasn't a discharge order. And if one were to at least look at the position of interim receivers having been appointed by the state court, whether it was statutory or not, but certainly the Court had an equitable reason for establishing the receivership in whatever form, you know, counsel wants to argue is appropriate, it still required an end date, is still required an end discharge order, which will be forthcoming once we file our final report.

[*Id.* at pp. 122-24] When advised of the Defendants' actions, the state court did not approve the attempted transfer of lifetime breeding rights to Green and Ms. Cunningham. [*Id.* at pp. 133-34][18]

At some point during 2009, Einstein was sold to Adena Springs. Although the receiver was aware of the defendants' attempts to convey lifetime breeding rights to Green and Ms. Cunningham, such rights were not transferred in connection with this sale. As a result, the relief being sought by Green at the present time is unclear. However, regardless of the nature of the relief she is seeking, it is clear that her claim has no basis. It is apparent that Green did not provide any substantial services or assistance in connection with the

---

[18]In attempting to submitting bills for attorney fees in connection with the work performed purportedly on behalf of Tandy, LLC. Mr. Regard included a five percent sales commission in connection with the sale of Einstein to Adena Springs. This sales commission was submitted on behalf of his company, Occidental Thoroughbreds. [*Id.*, p. 134] This sales commission was rejected by the receiver.

management of the thoroughbred Einstein.  Instead, the Court concludes that the claim she
has filed in this proceeding is a transparent attempt to shield assets on behalf of her
boyfriend, Defendant William Gallion.

It is equally clear that, in attempting to transfer lifetime breeding rights to Green and
others, Defendants Cunningham and Gallion directly violated the specific conditions of
release imposed prior to the attempted transfers.  The Orders Setting Conditions of Release
for both Gallion and Cunningham specifically prohibited the defendants from transferring
any item of property exceeding $5,000.00 at one time or a total of $10,000.00 in one month
without Court approval.  Further, the defendants were specifically prohibited from making
any gifts, either individually or through any business entity, in excess of $1,000.00.
Cunningham signed the Order which included these restrictions on August 27, 2008.
[Record No. 592]  Likewise, Gallion signed a similar Order on September 11, 2008.  Both
Orders were filed in the record of this proceeding shortly after they were executed by the
defendants.

### V.    The United States' Motion to Strike the Claim of Melissa Green

The United States has moved the Court to strike Green's claim for three reasons.
First, it contends that she has not set forth a specific claim as mandated by 21 U.S.C.
§ 853(n)(3).  Second, the United States asserts that Green lacks standing to assert a claim in
any of the property subject to forfeiture.  And third, the United States argues that Green
cannot state a valid claim under 21 U.S.C. § 853(n)(6) in property that was vested at the time
it became subject to forfeiture.  [Record No. 1213]  In connection with this last argument, it

asserts that Green was not a bona fide purchaser for value who, at the time of purchase, was without cause to believe that the property was subject to forfeiture.

As noted above, Green did not testify during the May 24, 2010, ancillary hearing. Likewise, her attorney did not present any evidence supporting any of her claims unrelated to the alleged lifetime breeding right to Einstein. However, in an earlier deposition, Green testified that she did not have any information regarding Defendant Gallion's assets. In fact, Green asserted that she and Gallion kept their finances completely separate and she denied any ownership interest in his various accounts. In essence, she has merely lived at his former residence in Jessamine County, Kentucky (the property described as "21 Avenue of Champions") since meeting him approximately six years ago. [*See* Record No. 1213, Exhibit A, deposition pages 18, 32, 35, 44, 50, 61-62, 72, and 91]

As the United States correctly points out, in determining whether a claimant has met her burden of proof, the court may consider the claimant's prior statements denying ownership. *See United States v. Derenak*, 27 F. Supp. 2d 1300 (M.D. Fla. 1998). Further, a claim that fails to provide sufficient details regarding the nature of the claimant's interest may be dismissed for failure to comply with the statutory filing requirement. *See United States v. BCCI Holdings (Luxembourg) S.A.*, 69 F. Supp. 2d 36, 55 (D.D.C. 1999) (discussing dismissal of claims that did not satisfy filing requirements under the parallel forfeiture provision in the RICO statute, 18 U.S.C. § 1963(l)(6)). Section 853(n)(3) requires that a claimant "set forth the nature and extent of the petitioner's right, title, or interest in the property, [as well as] the time and circumstances of the petitioner's acquisition of the right,

-43-

title, or interest in the property." 21 U.S.C. § 853(n)(3). Here, Green's claims fail due to her prior denials and because she has failed to submit any proof to support her assertions that she has any ownership interest. With respect to her claims involving one-third of all funds and property associated with WJG Investments, LLC (Florida), Tracts 1 and 2 of the property located at 21 Avenue of Champions, Nicholasville, Jessamine County, Kentucky, 40356, the property located at 5873 Ware Road, Lexington and Paris, Kentucky, Fayette and Bourbon counties respectively, and one-third of the funds being held in Account #XXXXXXX1220 at the Vanguard Group in the name of WJG Investments, LLC (Florida), Green has not only denied any interest in the assets, she has failed to provide any basis in support of her assertions. Accordingly, those claims will be dismissed.

With respect to her remaining claim, it is clear that Green was acutely aware of the pending criminal charges against Defendant Gallion at the time of the purported transfer of a lifetime breeding right in Einstein. In addition to living with Gallion, she attended numerous court proceedings in which Gallion's fraudulent activities were discussed in intimate detail. Additionally, it is clear that Green was aware of the state court's oversight of Tandy, LLC since November 2007. Based on the testimony and other evidence presented, the Court is convinced beyond any doubt that the attempted transfer to Green was an attempt to circumvent oversight of the state court while hiding and transferring assets away from the government and other parties having an interest in them. The purported transfer also constitutes a violation of the Order Setting Conditions of Release for Gallion filed September 11, 2008. [Record No. 610]

Green has not established that she performed any work in exchange for the lifetime breeding right in Einstein that the Defendants attempted to convey to her. In any event, however, her claim fails due to lack of standing. Green is, at best, an unsecured creditor. *See United States v. Numerous Parcels of Real Property*, No. 8: 04-cv-150-T-30EAJ, 2006 WL 3248573, at *3 (M.D. Fla. Nov. 7, 2006) (A drug dealer's live-in girlfriend lacked an ownership interest in real property even if she contributed to the mortgage and utility payments. At most, the girlfriend was an unsecured creditor.). Although an unsecured creditor may have standing to assert claims under § 853(n), such a creditor "must make at least a prima facie showing of a 'vested' or a 'superior' interest" in the property subject to forfeiture. *Campos*, 859 F.2d at 1239; *see also United States v. Salti*, 579 F.3d 656, 669 (6th Cir. 2009) (reaffirming *Campos*). Here, Green has not demonstrated a vested interest in the property, nor has she shown that she has an interest superior to that of the defendants. However, Green's claim also fails for a more important reason. A person acquiring an interest in property through fraud lacks standing to assert a claim in that property. *5208 Los Franciscos Way*, 385 F.3d at 1192. As outlined above, the Court concludes that the attempted transfer to Green was fraudulent in that it was made without consideration, in violation of specific bond conditions, and in an effort to shelter assets subject to foreclosure.

In summary, Green does not have standing to assert a claim in any property subject to this forfeiture proceeding. Additionally, she has not established a right in any property under 21 U.S.C. § 853(n)(6)(A) because the interest she attempts to assert did not vest before the interest of the government attached. *See Stowell*, 133 U.S. at 16-17; *McHan*, 345 F.3d

-45-

at 272; *O'Brien*, 181 F.3d 105.  Green has not been a member of the entity holding the real property in which she claims a one-third ownership interest.  Likewise, the financial account with the Vanguard Group being held in the name of WJG Investments, LLC (Florida) was opened by Defendant Gallion with money received from the 2001 Fen-Phen settlement. Green claims to have met Gallion sometime after this fund was established.  And by her own admission, she and Defendant Gallion kept their finances "totally separate."  Accordingly, her claim under 21 U.S.C. § 853(n)(6)(A) is without a factual or legal basis.

Green's claim under 21 U.S.C. § 853(n)(6)(B) is also without merit.  Under the facts presented, she cannot assert in good faith to be a bona fide purchaser of any interest in any of the properties she has identified as being subject to her claims.

### VI.    The Claim of First National Bank

First National Bank loaned Tandy, LLC funds which were used to purchase an airplane.  Following default, the airplane was sold and First National Bank obtained a deficiency judgement of approximately $163,000 for the balance due after the proceeds of the sale were applied to the unpaid balance of the loan.  The bank has asserted an interest in Tandy's assets under 21 U.S.C. § 853(n)(6)(B), claiming to be a bona fide judgment creditor.

In response, the United States agrees that First National Bank was a secured creditor with respect to the airplane.  However, the United States contends that once the airplane was sold, the bank became merely an unsecured creditor with respect to its deficiency judgment and thus lacks standing to pursue a claim.  Further, it contends that, under the bona fide purchaser prong of 21 U.S.C. § 853(n)(6)(B), the bank had knowledge of the government's

interest in the property subject to forfeiture by August 2009 and therefore cannot be a bona fide purchaser under the statute.[19]

Because First National's security interest was in the airplane, the United States is correct that following the sale of the airplane, the bank is no longer a secured creditor. *See In re Hoffman*, 359 B.R. 163, 166 (E.D. Mich. 2006) ("[O]nce the secured creditor liquidates its collateral and applies the proceeds to the debt, any remaining debt is not secured by any existing collateral."); *see also Americredit Fin. Servs. v. Moore*, 517 F.3d 987, 989 (8th Cir. 2008) (where a secured creditor has sold the collateral and applied the proceeds to the debt, "the deficiency claim is a general unsecured claim"). The Sixth Circuit held in *Campos* that unsecured creditors are not bona fide purchasers and therefore cannot recover under § 853(n)(6)(B). *See* 859 F.2d at 1238. Thus, First National's claim fails.

## VII.   The Claim of Gayle Garrison

Gayle Garrison filed a verified claim on April 9, 2010, contending that he is also entitled to a lifetime breading right in the thoroughbred Einstein or, alternatively, $45,000 which represents 2.5% of the sales price. [Record No. 1210] Garrison's claim was filed by Joseph Black, an attorney employed by the Law Office of Andre Regard. The United States has also moved the Court to strike this claim.

Garrison's claim is based on a document captioned "Assignment and Transfer of Lifetime Breeding Right" for Einstein. A copy of this document is attached as Exhibit 1 to

---

[19]First National's counsel conceded during the May 24, 2010 ancillary hearing that the bank could not prevail under § 853(n)(6)(A). [Tr., at p. 143]

his Petition.  A copy was also introduced during the May 24th hearing as Garrison Exhibit No. 1.  The assignment purporting to convey this lifetime breeding right is similar to the assignment executed in favor of Green and Ms. Cunningham by Defendants Gallion and Cunningham.  In relevant part, Garrison asserts in his petition that, at the time Tandy, LLC became subject to this Court's Second Amended Preliminary Forfeiture Order (August 20, 2009), he was in the process of obtaining payment for his assignment by intervening in the Boone Circuit Court action.  However, when the United States Marshal seized Tandy, LLC and its property, he asserted an interest in this proceeding.  According to Garrison, he acquired his lifetime breeding right as a result of and in consideration for "racing and management and horsemanship [he] performed for Thoroughbred Einstein."  He further asserts that, because his services were of substantial value, the worth of Einstein resulted in a higher price being received for the thoroughbred at the time it was sold to Adena Springs.

During the May 24, 2010, hearing, Garrison offered testimony which was consistent with the statements contained in his Petition.  In relevant part, Garrison testified that he has been involved in the horse business for approximately fifty years.  [*Id.* at p. 148-49]  From 1969 until 2004, Garrison was employed by Echo Valley Horse Farm as manager of its thoroughbred operations.  Garrison's compensation at that farm included bonuses.  With respect to horses successfully sold, he testified that he would receive as much as $10,000 to

$15,000 if a horse sold for as much as $1,000,000.  Garrison described this as "standard" in the industry.  [*Id*. at p. 151][20]

In February 2004, Garrison retired from his employment at Echo Valley and became employed by Defendant Cunningham.  Garrison claims that, at the time his employment commenced, he was unaware of the criminal allegations involving the defendants.  However, he admits that sometime in mid-2006, he had "heard bits and pieces about it in the paper." [*Id.*, at p. 158-59] Later in his testimony, Garrison asserted that, as of January 31, 2009, he was unaware that a criminal action was pending against Cunningham.  [*Id.*, p. 165]  With respect to this and other issues, Garrison's testimony also appears to have been driven by the questions of his attorney.[21]

In explaining his compensation agreement, Garrison offered the following testimony during his direct examination:

> Q.   Okay.  Can you tell me a little bit about the agreement that you–all came to for you to be a farm manager.
>
> A.   Well, we came to a price per year of $48,500 plus hospitalization, and he said, "Through the years we'll give you a bonus like I give my staff at the law firm," said, "I generally pay bonuses in cash."

---

[20]Garrison also claimed that, at one point, he received the cash-equivalent of a new car when a horse from the farm won the Kentucky Derby.  [*Id.*]

[21]During cross-examination, Garrison admitted that he was aware that Cunningham was incarcerated in 2008.  He also conceded that he was aware of the first criminal trial that occurred during the summer of 2008.  He was also aware of the second trial in early 2009.  However, he continued to assert that, at the time of the assignment in January 2009, he did not know the status of this ongoing criminal action.  [*Id.*, at pp. 167-68]  The Court does not give any weight to this portion of Garrison's testimony.

Q.     Can you talk to me a little bit about the bonuses?  Did he ever – at that point, when you first started out –

A.     Yes, sir.

Q.     – did he talk to you about any specific bonuses or is that something –

A.     Well, he said, you know, through the year, you can get sale bonuses if you sell horses or if we sell a horse, you get a bonus.  And so the first bonus I got was off of Curlin when he sold.

Q.     What kind of bonus did you get?

A.     7500.

Q.     Is that tied to like a percentage or anything?

A.     No, it wasn't a percentage.  That's just – you know, it was just what he gave me.

Q.     When did you get that?

A.     Probably a week or two after Curlin sold.  I don't know exactly what date.

Q.     And is that pretty standard at that time –

A.     Yes, sir.

Q.     – for other managers in the industry?

[*Id.* at p. 152-53]  However, later in his testimony, Garrison stated that the issue of bonuses was not raised until he approached Cunningham in mid-2006 concerning the criminal allegations.  According to Garrison, at that time, Defendant Cunningham promised bonuses in the form of breeding rights if Garrison would remain as farm manager.  [*Id.* at pp. 159-60]  When he was shown the assignment dated January 31, 2009 (Garrison Exhibit No. 1) and

-50-

asked if January 2009 was the first time that Cunningham had raised the issue with him,
Garrison responded that the issue was first raised in October or November of 2008. [*Id.* at
pp. 162-63] If true, this conversation would have occurred approximately two to three
months after Cunningham would have signed the Order Setting Conditions of Release in
which he agreed that no such gifts or transfers would take place.

Based on this ambiguous and conflicting testimony, the Court concludes that neither
bonuses nor promises of bonuses resulting from the sale of Einstein or other thoroughbreds
was an element of Garrison's employment contract. Further, the Court concludes that
Garrison did not request a lifetime breeding right. [*See Id.,* at pp. 168] Instead, Defendant
Cunningham prepared the assignment in a further attempt to transfer assets which would
otherwise be subject to either forfeiture by the government or acquisition by judgment
creditors. These conclusions are supported by Garrison's testimony concerning his
conversation with Defendant Cunningham allegedly occurring in late 2008.

> Q.    Can you tell me what the conversation was?
>
> A.    Well, he just said – he said, "I want to do something for you, man."
>       Said, "The way things are," he said, "I just want to make sure I take
>       care of you for what you've done." And he told me, said, "I'm going
>       to try to get you a lifetime breeding right to Einstein."

[*Id.*, p. 163] With the assistance of his willing accomplice Andre Regard, Cunningham
attempted to do just that. However, Cunningham's actions were fraudulent.

Garrison has not offered any documentation in support of his claims that he received
bonuses in the past when horses were sold. Likewise, with the exception of Curlin, there is

no indication that Cunningham paid Garrison any bonus when any other thoroughbred was sold. [*Id.*, at p. 170]  While this may be explained by the fact that other horses sold were not of the caliber of Curlin or Einstein, the fact remains that prior bonuses were not reduced to allegedly enforceable agreements.  Garrison's testimony also undercuts his assertion that his receipt of a lifetime breeding right (or, alternatively $45,000) was standard in the industry. First, the value of the lifetime breeding right being asserted is substantially greater than any bonus he had received in the past or that he had an expectation of receiving.  For example Garrison's bonus from his prior employer when a Kentucky Derby winner was sold amounted to approximately 1 to 1.5% of the sale price.  Likewise, the bonus of $7,500 when Curlin was sold represents approximately .2% of the sale price for the interest held in that horse.  Here, however, he seeks to recover 2.5%.  Likewise, but for his unsolicited and unrequested receipt of the assignment in January 2009, the bonus he seeks to recover would be completely unenforceable.  As Garrison acknowledged in response to questions from the Court, a bonus in the horse industry is essentially a gift with absolutely no obligation on the thoroughbred owner's behalf to make any payment.  [*Id.*, at p. 171]

Following Garrison's testimony, the United States re-called Sylvius Von Saucken to offer additional testimony regarding this claim.  Von Saucken confirmed that, as receiver, Garrison was reimbursed and received full payment for the services he rendered for Tandy, LLC as farm manager through July 2009.  With respect to Garrison's claim for a lifetime breeding right in Einstein, Von Saucken testified that, while the state court interim receiver did not ratify or approve the assignment of a lifetime breeding right to Garrison, "in the final

purchase agreement with [Adena Springs], Mr. Garrison has a lifetime breeding right in Einstein." At the time of the May 24, 2010, hearing, the state court had not yet determined whether Garrison would be allowed to liquidate that right and receive $45,000 pursuant to the terms of the January 31, 2009, assignment from Defendants Cunningham and Gallion. Von Saucken offered the following explanation for not objecting to allowing Garrison to retain a lifetime breeding right while objecting to the conversion of that right to cash:

> A.   . . . and this is really the Boone County Circuit Court's position. To give away a breeding right doesn't cost any dollars, but to actually put money aside and pay the present value of these future breeding rights costs dollars and could dissipate the victim's fund or could dissipate the amount of assets that are available for whoever gets Tandy afterwards. So there's a distinction between cash and a breeding right that really doesn't cost anything other [than] to recognize the great service that both Mr. Garrison and Ms. Pitts provided for Einstein.

[*Id.*, at pp. 182-83]

## VIII.   The United States' Motion to Strike Garrison's Claim

The United States has moved to strike Garrison's claim for some of the same reasons it seeks to have other claims dismissed. [Record No. 1216] First, it asserts that Garrison lacks standing to assert a claim. With respect to this argument, the United States argues that Garrison's claim to a lifetime breeding right, converted to cash, constitutes an unsecured claim. According to the government, Garrison was clearly aware of the criminal charges pending against Defendants Cunningham and Gallion at the time of the alleged transfer. The transaction occurred between the Defendants' first and second criminal trials. Additionally, it contends that all parties to the assignment of the lifetime breeding right were aware that

Tandy, LLC was subject to state court oversight at this time and that the assignment was not approved by the state court.

The United States indicates that, under Kentucky law, the property held by Tandy, LLC, was *in custodia legis* and the receiver appointed by the Boone Circuit Court had complete dominion and control over it. *Union Carbide Corp. v. Kentuckiana Sales Co.*, 423 S.W.2d 243 (Ky. 1968). Further, the risk that Defendants Gallion and Cunningham would attempt to perfect preferential transfer to business associates and family members represented part of the original justification for the appointment of a receiver by the state court to manage the affairs of Tandy, LLC, and avoid dissipation of the company's assets. Therefore, to be bound to a corporate obligation, a receiver must affirmatively indicate his election to be responsible for the prior obligations of the former operators. *Hamilton Gas Co. v. Inland Gas Corp.*, 102 F.2d 131, 135 (6th Cir. 1939).

The United States also notes that Garrison has been paid for the work he performed on behalf of Tandy. However, even if he could argue that the assignment and transfer of a lifetime breeding right were valid under Kentucky law, his claim would nevertheless fail because he acquired the right as part of a fraudulent transfer. *See* Ky. Rev. Stat. Ann. § 378.010; *5208 Los Franciscos Way*, 385 F.3d at 1192.

Furthermore, Garrison was aware of the nature of the criminal proceedings pending against Defendants Gallion and Cunningham at the time Cunningham offered him the assignment of a lifetime breeding right in Einstein. While the defendants could not make a direct gift to Garrison from corporate assets of Tandy, LLC, for the same reasons they could

-54-

not make an indirect gift to him by assigning a lifetime breeding right with full knowledge that Einstein would be sold.

Second, the United States argues that Garrison cannot state a valid interest in property under 21 U.S.C. § 853(n)(6)(A) or (B). Again, it points out that any interest Garrison had to a lifetime breeding right did not vest before the United States acquired its interest. As the Court has found previously, the United States' interest vested at the time of the inception of the defendants' fraud upon their clients. Garrison's claimed interest came into being much later by his own admission. Thus, his claim fails under 21 U.S.C. § 853(n)(6)(A). And his claim under 21 U.S.C. § 853(n)(6)(B) fails because he is not a bona fide purchaser of the asset.

### IX.    The Claim of Cognac, d/b/a Occidental Thoroughbreds

Cognac, LLC, doing business as Occidental Thoroughbreds, filed its claim on April 5, 2010. [Record No. 1205] It asserts that, on December 2008, it was authorized by Tandy, LLC, to act as thoroughbred sales agent for the sale of the thoroughbred Einstein. And as sales agent, it contends that it is entitled to 5% of the sale price, or a total commission of $90,000. Cognac argues that it is entitled to payment as a vendor of services under 21 U.S.C. § 881(e)(2)(A)(I), and under the ordinary and necessary expense provision of 21 U.S.C. § 853.

According to Cognac, it has been in the process of obtaining payment from Tandy, LLC, through a civil action filed in the Fayette Circuit Court. Likewise, it has also intervened in the Boone Circuit Court action. However, it contends that the United States

removed the action pending in the Fayette Circuit Court before the entry of an agreed order which would have allowed payment of $72,000. The agreed order was apparently negotiated between Occidental and Defendant Cunningham.

In support of its argument that the services it provided were of substantial value and benefit and increased the value of Einstein, Cognac offered the testimony of Andre Regard during the May 24, 2010, ancillary hearing.[22] Regard was represented during this hearing by another member of his firm, Joseph Black. Regard is a principal of Cognac, LLC. [Tr., pp. 188-89] Further, at times relevant herein, he has represented Tandy, LLC as an attorney. However, as noted above, his bona fides have been questioned. While the issue of whether Regard was actually representing the interests of the Defendants as opposed to Tandy, LLC was disputed at the time of the ancillary hearing, it is clear to the Court that he has maintained an adversarial relationship with the receiver in the Boone Circuit Court action.

Regard testified that Occidental Thoroughbreds first performed work for Tandy in connection with the use of five breeding rights when the thoroughbred Curlin went to stud. At that time, the company assisted in analyzing the various mares that would be bred to Curlin. Following this work, Regard was approached in December 2008 and January 2009 by Defendants Gallion and Cunningham in connection with seeking a potential buyer for Einstein. Regard believed that, at the time these conversations occurred, day-to-day management of Tandy, LLC had been returned to the Defendants. [*Id.*, at p. 191] And

---

[22]In addition to incorporating his previous testimony given in connection with other claims, Regard also testified in support of Cognac's claim. [Tr., pp. 188-243]

although Regard was aware of the criminal proceedings involving Defendants Cunningham and Gallion, he stated that he was "hopeful" that they would prevail when the matter proceeded to trial for the second time in early 2009. [*Id.*, at p. 194] He indicated, however, that as of January 2009, he was not aware of any forfeiture actions by the government. [*Id.*] Regard admitted that he was aware that Tandy, LLC would "potentially" be subject to forfeiture as a substitute asset. However, at the time Occidental Thoroughbreds negotiated the sale of Einstein with Adena Springs, Tandy was not subject to forfeiture. [*Id.*, at 216][23]

With respect to payment for services to be rendered, Regard testified as follows:

A.    The agreement was that if we did any mare share or foal shares, Occidental Thoroughbreds would have the right to consign those horses and sell them. So the compensation for actually finding the mare, actually obtaining the mare [to be bred to Curlin], would be the right to sell that mare or that offspring. So it's a contingent interest in selling that offspring, because those offspring may sell for, you know, we were thinking $200,000, $300,000, and the standard is a five percent commission, and the agreement on selling Einstein would be a standard five percent commission.

Q.    And what kind of responsibility did you have in order to earn that five percent commission?

A.    Well, the responsibility is very different [than] what I was doing in the legal field. In the legal field I was dealing with various legal issues dealing with ownership, licensing, where purse monies were, et cetera.

---

[23]Regard testified that he first became aware of the forfeiture of the Defendants' assets in June 2009 following their second trial and resulting convictions. [*Id.*, at pp. 194-95] He attended a meeting with Von Saucken and certain assistant United States Attorneys around this time. According to Regard, there was "some miscommunication" during this meeting concerning his role in the proceedings. [*Id.* at p. 195] Regard believed that he was present as a representative of Tandy, LLC. Regard also states that, "[h]ad the U.S. Attorney told me when I met them in June that they were taking over everything, I would have reported that to the interim receiver and I would have stopped doing anything . . ." [*Id.*, at p. 217]

This was a totally different effort, it was an effort to go out and actually
solicit mare owners and stallion farms and racing stables to see what
their interest was in acquiring these assets or utilizing these breeding
rights.

[Tr., at pp. 193-94]

Regard further testified that he then contacted various stallion farms and racing
organizations during the winter and spring of 2009. [Id., at pp. 189-90]

According to Regard, at least three offers were made for Einstein.  One offer from
Millennium Farms was not deemed acceptable.  During this time, Regard indicated that he
was advised by the judge presiding over the Boone Circuit Court action that, if an offer was
received which was acceptable to Defendants Cunningham and Gallion, Regard should
present it to the court for consideration.  However, neither the offer from Millennium nor a
separate offer from a third party were acceptable to the Defendants.  Thus, neither was
submitted to the court for review.

While Regard outlined the efforts undertaken to obtain top dollar for Einstein, he
stated that he had limited conversations with the receiver or the Boone Circuit Court while
this work was being performed.  [Id., at p. 199]  However, with respect to his conversations
with the Adena Springs (the eventual purchaser), Regard stated that he had "no reason to
believe they weren't aware of it."  [Id., at p. 200]  He also concedes that he did not have any

conversations with anyone in the United States Attorney's office about the sale or

negotiations concerning the sale.[24]

The last version of the purchase and sale agreement drafted by Regard for the sale of

Einstein to Adena Springs is dated July 29, 2009.  A copy of this document was introduced

during the May 24, 2010, ancillary hearing as Cognac Exhibit No. 1.  It reflects Tandy, LLC,

doing business as Midnight Cry Stable, as the seller of the thoroughbred and Alpen House,

ULC, a Canadian corporation, as the buyer.[25]  This document was not entered into by the

parties to the transaction, but it represents the basis for Occidental Thoroughbred's claim.

Regard is identified in the initial paragraph of the agreement as the attorney for the

seller.  The document also reflects a sales price of $1,750,000.  However, in paragraph 7.1,

the seller seeks to retain five lifetime breeding rights which are reflected as being assigned

---

[24]According to Regard, the United States did not actively assert any management authority
until most of Tandy's assets were liquidated.

    A.        – well, the two remaining assets, which is the Curlin 20 percent cash and I
believe Bandini share or season or something.  But basically we've gotten it
down to where all there is left is cash and the interest in Curlin.  And now the
U.S. Marshal's Office has aggressively taken an action to take over
management authority of that.  But up until March of this year, I was of the
belief the U.S. Attorney, and I think it would [be] true, had delegated
everything.  I don't believe they signed the deal to sell Einstein, I don't
believe they signed any of the contracts for the 2010 breeding rights, I don't
believe the U.S. Attorney or the U.S. Marshal signed any of the sales
contracts for Keeneland or for Fasig-Tipton or for Taylor Made or any of
those transactions.

[*Id.*, at p. 201]

[25]This company either owns or is affiliated with Adena Springs. [Tr., at p. 205]

to: (i) Helen Pitts, (ii) Occidental Thoroughbreds (iii) Patricia Cunningham, (iv) Melissa Green, and (iv) Gayle Garrison. More specifically, this provision states that:

> 7.1    Breeding Right.        Seller shall be entitled to a total of five (5) lifetime Northern Hemisphere Breeding Right[s] to EINSTEIN in consideration of his ongoing efforts to promote EINSTEIN. The Five Breeding Rights will be assigned to the following entities: 1) Helen Pitts 2) Occidental TB. 3) Patricia Cunningham 4) Melissa Green 5) Gayle Garrison. For purposes of this Agreement, the "Breeding Right" shall be a right to breed one thoroughbred mare to EINSTEIN in each Northern Hemisphere breeding season for the breeding life of EINSTEIN. The Breeding Right may not be sold, exchanged, transferred, assigned or otherwise disposed of without the prior written consent of Purchaser and is non-cumulative from one breeding season to another. Provided, however, that the nomination attributable to the Breeding Right may be sold, transferred, assigned or otherwise disposed of in any breeding season for that season. The holder of the Breeding Right shall not have any ownership interest in EINSTEIN and shall not be required to pay any part of any expenses associated with ownership of EINSTEIN.

[Cognac Exhibit No. 1] Thus, through this document, Tandy, LLC represented that the five breeding rights in Einstein – valuable assets of the company – would be reserved in consideration of the *seller's ongoing efforts* to promote the horse. Further, restrictions would be placed on the use of the rights reserved in Einstein. And, in addition to a seller's commission of 5%, Regard's company would be given one of these lifetime breeding rights. This was in addition to the attorney's fee that he sought to recover for his work in connection with the transfer of the horse. While Regard testified that a 5% sales commission was "standard" in the industry [Tr., at p. 202], he did not address the fact that he also included a lifetime breeding right for his company in the agreement with the purchaser.[26]

---

[26]Regard testified that his position as counsel for Tandy, LLC, and his company's simultaneous role as sales agent for the company as being "complicated." According to Regard,

An earlier version of the proposed purchase and sale agreement for Einstein was also
attached to the document introduced as Cognac Exhibit No. 1.  Unlike the July 29, 2009,
document, the earlier version, dated July 4, 2009, did not provide for five lifetime breeding
rights designated to Pitts, Ms. Cunningham, Green, Occidental or Garrison.  Instead, the
corresponding version of this document provided as follows:

> 7.1    Breeding Right.        Seller shall be entitled to a total of four (4) lifetime
> Northern Hemisphere Breeding Right[s] to EINSTEIN in consideration of his
> ongoing efforts to promote EINSTEIN.  For purposes of this Agreement, the
> "Breeding Right" shall be a right to breed one thoroughbred mare to
> EINSTEIN in each Northern Hemisphere breeding season for the breeding life
> of EINSTEIN.  The Breeding Right may not be sold, exchanged, transferred,
> assigned or otherwise disposed of without the prior written consent of
> Purchaser and is non-cumulative from one breeding season to another.
> Provided, however, that the nomination attributable to the Breeding Right may
> be sold, transferred, assigned or otherwise disposed of in any breeding season
> for that season.   The holder of the Breeding Right shall not have any
> ownership interest in EINSTEIN and shall not be required to pay any part of
> any expenses associated with ownership of EINSTEIN.

[Cognac Exhibit No. 1; attached draft]

---

I tried my best to keep everything very, very clean and differentiated.  There were
some questions that came up in the receiver's mind for approximately $1100 in bills
that he thought might have been a little too close to the negotiations, even though,
in fact, there were lots of issues going on with Einstein, there were a lot of purse
issues, licensing issues, there were offers that were being made.  There was this offer
that came in from the Fame Racing that had nothing to do with the solicitation
process that I was asked to review and follow up on and that was what part of the
billings were.  But the receiver said, look, you know, what I recalled was there's
going to be a commission involved in this transaction, so we're not going to pay you
for that legal work.  So I didn't protest.

[*Id.*, at p. 209]

The document introduced as Cognac Exhibit No. 2 consists of a fax letter dated July 28, 2009, from Mike Rogers of Adena Springs to Andre Regard.  This letter apparently accompanied the Einstein Purchase and Sale Agreement dated July 29, 2009.  The second page of this exhibit is a July 30, 2009 letter from Dermot Carty, Director of Sales for the Alpen House, ULC.  This letter indicates that, under paragraph 7.2 of the purchase and sale agreement, Occidental Thoroughbreds is to receive a 5% commission from the proceeds of the sale.

According to Regard, he advised the judge of the Boone Circuit Court action that an offer had been made around the time it was first received from the eventual purchaser – July 4, 2009. [Tr., p. 205] He also testified that, after Adena Springs' offer was increased to $1,750,000 plus 25% of future race earnings, an other offer was made.  Both offers were subject to objections by the plaintiffs in the Boone Circuit Court action.  Subsequently, Adena Springs contacted the receiver directly and entered into what Regard described as "practically the same deal."  [*Id.*, at pp. 207-08]  As a result, Regard claims that, as "procuring agent" for the transaction, he is entitled to a five percent commission.

Regard has not sought to recover in this action the attorney fees which were disallowed in the Boone Circuit Court action.  However, during the ancillary hearing, he introduced a document as Cognac Exhibit No. 3 as part of his explanation that these fees were properly incurred in connection with his legal work for Tandy, LLC.  [*Id.*, at pp. 210-11]  Additionally, he testified that none of the work he performed while wearing the "Occidental Thoroughbreds" hat was billed as legal fees.  [*Id.*, at pp. 213-14]

Occidental Thoroughbreds initially submitted a claim for payment of a 5% sales commission for the sale of Einstein in the Boone Circuit Court action. [*Id.*, at pp. 218-19] However, the state court did not take action on Occidental's request. As a result, the company filed a civil action in the Fayette Circuit Court based on Regard's assertion that the transaction giving rise to the claim occurred in Fayette County, Kentucky. [*Id.*, at pp. 219-20] Additionally, as sales agent for another transaction for the Defendants, Occidental Thoroughbreds withheld the proceeds ($72,000) from that transaction as an offset.[27] Occidental attempted to serve the receiver for Tandy, LLC. However, he refused to file an answer based on his position as a receiver appointed by the Boone Circuit Court. Additionally, Occidental served Defendants Cunningham and Gallion. It did not, however, attempt to join the United States in that action.

Regard testified that he attempted to negotiate a settlement of this claim with Defendant Cunningham on behalf of the "adverse parties" in the Fayette Circuit Court. According to Regard, Defendant Cunningham contacted him following receipt of service of process and offered a settlement of his $90,000 claim by allowing him to retain the amount

---

[27]The horse, Peak Maria's Way, sold for $200,000. Under Tandy's mare share agreement, it would have received 40% of the proceeds, less a commission of 10%. [*Id.*, at pp. 222-23] This sum is currently held by Fifth-Third Bank under an account titled "Occidental Thoroughbreds." [*Id.,* at p. 226] During the Fayette Circuit Court action, Occidental Thoroughbreds sought and obtained pre-judgment garnishment of this money through an ex parte proceeding. At the conclusion of the May 24, 2010, ancillary hearing, the Court sustained the United States' motion to set aside the order entered by the Fayette Circuit Court. At the time of the hearing, that action had been removed to this Court. As a result of this action, the funds being held by Fifth-Third Bank became subject to an order of the Boone Circuit Court directing that they be transferred to either the United States Marshal or the interim receiver. [*Id.*, pp. 269-70]

held as an offset ($72,000). The proposed Agreed Order to be submitted to the Fayette Circuit Court was introduced during the ancillary hearing as Cognac Exhibit No. 4. However, before this so-called "arms-length" settlement could be completed and presented to the state court for approval, that action was removed to federal court. [*Id.*, at pp. 223-24]

Regard testified that he also asserted a claim in the Fayette Circuit Court action under a quantum meruit theory because, under KRS § 230.357, the commission he seeks to recover was not identified in the final purchase agreement. He concedes that, under this statutory provision, if the commission is not identified in the relevant documents, he may not claim a commission as sales agent. [*Id.*, at pp. 230-31]

During cross-examination, Regard admitted that he was aware of the indictment returned against Defendants Gallion and Cunningham in 2007. And while he was aware that the Defendants were charged with substantial fraudulent activities, he claimed that he did not review the indictment because it was not in his field of expertise. However, he also conceded that a forfeiture judgment against the Defendants could be returned if the two were ultimately convicted of the charges against them. [*Id.*, at p. 234] Regard denies that he viewed his work as an equine agent and as counsel for Tandy, LLC, to be inconsistent or as raising ethical concerns.

In addition to admitting that Occidental Thoroughbreds did not have a contract with the receiver in the Boone Circuit Court action to arrange the sale of Einstein, he also admitted that the company did not have a written contract with Tandy, Gallion or Cunningham. Instead, he described the agreement as an oral agreement that was subsequently ratified by

virtue of Cunningham signing the Agreed Order which was to be tendered to the Fayette Circuit Court for review and possible approval. [*Id.*, at pp. 234-35]

Regard denied that the manner in which the proposed July 29, 2009 sales agreement for Einstein was drafted did not provide "perks" for Pitts, Ms. Cunningham, Green, or Garrison. Instead, he stated that he was aware that the Defendants intended to convey these lifetime breeding rights in the thoroughbred in January 2009 when he was asked to draft documents conveying these rights to these individuals. However, if that was his intention, he does not explain why those rights were not included in the first draft of the purchase and sale agreement sent to Adena Springs on July 4, 2009. Again, the Court finds it necessary to quote Regard's testimony concerning this issue. When asked about providing perks, Regard responded:

> A.    Well, I don't believe they were perks. I believe in January of 2009 Mr. Gallion and Mr. Cunningham asked me to draft a document which conveyed and transferred to Ms. Pitts, Mr. Garrison, Ms. Green, and Ms. Cunningham a lifetime breeding right with a conversion factor. I was requested to do that, so I drafted that document and provided it to them. Now, once that document had been drafted and provided, I knew of its existence. *Any deal that had to do with the horse would clearly have to take into consideration the existence of that document. And by the time that I was in communications with Adena Springs, which that's Alpen House or whatever, but we'll refer to it as Adena, I knew that document existed, so it certainly would be remiss not to include the provision of that document in the transaction.* But if you're implying that it was my idea to give those breeding rights to the people who got them, it wasn't my idea, I was asked by my client to do it.

[*Id.*, at pp. 235-36]

-65-

Regard also admitted that, during the "confrontational" meeting in June 2009, he did not advise representatives of the United States Attorney's office of his efforts to sell Einstein on behalf of Tandy, LLC. When asked to describe his role during that meeting, Regard testified that, at the time of the meeting, he was only wearing his hat as counsel for Tandy, LLC.

> A.    And I recall it being very confrontational and I recall actually being threatened with being somehow encumbering the forfeiture process when all I was there to do was to find out what I need to report back to the interim receiver.

> Q.    My question is, do you recall us asking you what your role was? Do you recall that? It's a simple question.

> A.    I believe you did ask me what my role was.

> Q.    Okay. Do you think the fact that you were working to find a buyer for Einstein in your capacity with Occidental Thoroughbreds was a fact that the U.S. Attorney's Office would have wanted to know when we met with you in June –

> A.    I don't know. I –

> Q.    – when we asked you specifically what your role was?

> A.    I don't – I wasn't approaching it as my position as Occidental Thoroughbreds. I came to that meeting purely as counsel for Tandy, LLC.

> Q.    I just want to be clear, though. You didn't mention your role with Occidental Thoroughbreds during that meeting, did you?

> A.    I may have.

[*Id.*, at pp. 238-39]

Following Regard's testimony, the United States recalled the state court's interim receiver, Sylvius Von Saucken, to offer additional testimony regarding Occidental Thoroughbred's claim.  As interim receiver, Von Saucken was involved in the liquidation of a number of assets belonging to Tandy, LLC.  This included approximately 26 horses.  In connection with these efforts, the receiver engaged in extensive discussions with thoroughbred experts.  [*Id.*, pp. 266-67]  Further, in August of 2009, Von Saucken also met with representatives of the United States Attorney's office and United States Marshals Service regard his plans for liquidation of assets.  According to Von Saucken, Judge Crittenden [Special Judge of the Boone Circuit Court] "was adamant about ensuring that we kept both this Court and the United States informed."  [*Id.*, at p. 267]

Von Saucken testified that, as interim receiver, he did not request that Regard find a buyer for Einstein.  Likewise, he did not enter into a contract with Occidental Thoroughbreds or Regard for this purpose.  [*Id.*, at p. 244]  Instead, Von Saucken first learned of Regard's efforts to sell Einstein following the first e-mail correspondence between Regard and representatives of Adena Springs.  He testified that he initially believed that the document was forwarded from Regard in his capacity as counsel for Tandy, LLC.

Upon receiving the documents in July 2009, Von Saucken was concerned with the rights that Tandy LLC was attempting to convey to third parties such as Ms. Cunningham and Green.  He also testified that the proposed agreement was contrary to the state court's liquidation strategy which required that the interim receiver "sign every contract" and "hire every outside vendor and agent."  According to Von Saucken,

. . . in fact, it took a Court order for this contract to become finalized.  And so not only did we propose a final version of this order and ask for both plaintiff and defense counsels' objections, but then it received an order from the Boone County Circuit Court ratifying and authorizing the receiver's execution of the contract.  This was done largely because besides Curlin, Einstein was the next largest most significant asset, and the Boone Circuit Court had long taken the position that it would require a court order before this asset were sold.

[*Id.*, pp. 245-46]

The final version of the purchase and sale agreement approved by the Boone Circuit Court on August 28, 2009, included lifetime breeding rights for Helen Pitts and Garrison. However, the rights that the Defendants attempted to convey to Ms. Cunningham and Green were not included.  Additionally, the final purchase and sale agreement had modified language concerning the percentage of race proceeds Tandy, LLC would receive.  This latter change resulted in a significant increase in moneys actually received from Einstein's races. [*Id.*, at pp. 246-47]

Von Saucken also explained his role in obtaining the eventual sum of $1,800,000 for Einstein.  Contrary to the impression given by Regard, due to a poor showing in the Arlington Million, Einstein's value decreased from the time Adena Springs offered $1,750,000 for the horse in late July of 2009.  Von Saucken was required to spend a significant amount of time negotiating the sale with Adena Springs.  [*Id.*, at p. 249]

. . . Einstein raced in the Arlington Millions[28] and he took fifth. And right after that, we received an offer of $1.35 million for the horse. So we went from 1.75 to 1.35 because he took fifth. Well, it's true that Fame Racing Stable came in and submitted a higher offer, but we were concerned about the bona

---

[28]The 2009 Arlington Million was run on August 8, 2009.

fide.  We had already vetted Adena Springs, we had vetted Stronach, and we understood from our perspective that placing Einstein with Adena Springs would give him the best platform with which to succeed, whether it's continuing his racing career or his breeding career.

So at the end of the day, our negotiations brought the purchase price back from 1.35 to 1.8 million with this 20 percent net on a per race basis, and those are substantially different, including – we did remove the commissions for Occidental and we removed Occidental's breeding right, because we didn't agree to them and we didn't know how they got there in the first place.

[*Id.*, at p. 248]  The Court found Von Saucken to be a credible, knowledgeable witness. Based on his testimony, the Court does not believe that the sale of Einstein to Adena Springs would have been completed without his significant efforts.  The Court also finds that Regard did not advise the interim receiver or the judge of the Boone Circuit Court of facts which were relevant and which should have been disclosed.  This includes the agreements which purported to transfer valuable assets to Ms. Cunningham and Green for no consideration.

Likewise, Von Saucken also testified that Regard did not distinguish his role as sales agent with Occidental Thoroughbreds from that as counsel for Tandy, LLC.  As a result, when Regard contacted him in July 2009 about the potential sale of Einstein to Adena Springs, Von Saucken understood that he was acting as Tandy, LLC's attorney.  The documents submitted as exhibits certainly support that such an impression was given, either intentionally or otherwise.  According to Von Saucken,

by April 13th of 2009, we [i.e., the state court receiver] were back in the picture.  At that point, he [Regard] should have come to us and said, we've been asked by – or Occidental has been asked by Gallion and Cunningham to assist in the sale of Einstein.  At the same time, we have these written documents.  I didn't learn about the written documents until well after we had sold Einstein, and when we sold Einstein, I think it's relevant, especially with

respect to what the Court has heard today, that the alter ego order, while it was alluded to earlier than September, did not, in fact, become the rule until after Einstein was sold. With respect to this issue, the alter ego order was issued on September 9th and became a part of the state court record on September 10th. We had sold Einstein in August 28th for an effective date of September 1st. That alter ego order, while relevant for subsequent transactions, that wasn't the case by the time we had sold Einstein or at the time we sold Einstein.

[*Id.*, at p. 249]

In late September or early October of 2009, Von Saucken received a letter from Regard disclosing the mare share agreement involving Peak Maria's Way. He testified that this was the first notification he received concerning this agreement. At Regard's request, the interim receiver contacted Lane's End Farm to obtain a release of the stallion certificate agreement. This was done with the understanding that Occidental Thoroughbreds would pay 40% of the net sale proceeds to the receiver. But that did not occur. Instead, Occidental took the action outlined by Regard during his direct testimony to garnish the funds through the action filed in the Fayette Circuit Court.[29]  Although Regard later sent a letter to the receiver proposing an offset, that proposal was rejected by the judge presiding over the Boone Circuit Court action.  [*Id.*, at pp. 251-52]

Finally, in explaining the degree of transparency required by the Boone Circuit Court for all transactions involving assets of the Defendants, Regard testified as follows:

And one thing that the Boone County Circuit Court was adamant about was the transparency that appeared to be lacking from the original transactions

---

[29]Von Saucken testified that he found it odd that, in light of the number of pleadings that were being filed in the Boone Circuit Court action, Occidental did not mention or infer in any of the filings that it had filed an action in the Fayette Circuit Court.  [*Id.*, at pp. 262-63]

between defendants and their clients. And so Judge Crittenden and now Judge Morris were very clear that they wanted open, honest, and transparent communications. So a transaction that would have changed the relationship of – even if it's not an ownership interest, if it's a season, that kind of a transaction that would have taken money off of the table or put money on the table, whether now or in the future, would have been ratified and would have needed a court order.

And in fact, you know, we're reasonably proud that we were able to liquidate 26 horses inside of three-and-a-half months and every one of those horses, whether by private sale or public auction, you know, it required a court order. As strange as it sounds, we went and got a court order to give a horse away. I mean, we gave a number of horses away because they were costing $1800 a month and their value was less than $500. SO instead of incurring that 1800-dollar charge, we gave the horses away. But before we did anything, we executed a purchase agreement, even if it was for zero dollars, a bill of sale, an agreement that the parties weren't going to destroy assets, and we went and got a court order for English Teacher – not for English Teacher, for Major Award and a couple of other horses.

[*Id.*, at pp. 260-61]

## X.    The United States' Motion to Dismiss Cognac's Claim

The United States has moved to strike this claim on the ground that Cognac lacks standing to assert it. The United States further argues that Cognac cannot prevail under § 853(n)(6)(A) or (B). [Record No. 1212] The Court agrees that Cognac's claim fails under both prongs of § 853(n)(6). First, Cognac's asserted interest clearly arose long after the commission of the acts giving rise to forfeiture. Therefore, under the relation back doctrine, the government's interest in Tandy, LLC is superior to any interest Cognac may have. *See Stowell*, 133 U.S. at 16-17; *McHan*, 345 F.3d at 272; *O'Brien*, 181 F.3d 105. Furthermore, Cognac is an unsecured creditor, and as noted previously, such a creditor cannot be a bona

fide purchaser for purposes of § 853(n)(6)(B).  *See Campos*, 859 F.2d at 1238.  Thus, Cognac's claim will also be dismissed.

**XI.    Conclusion**

No claimant has demonstrated entitlement under § 853(n)(6) to any property subject to forfeiture in this case.  Accordingly, it is hereby

**ORDERED** as follows:

(1)    The United States' Motion to Strike Claim of Patricia Cunningham [Record No. 1221] is **GRANTED**.

(2)    The United States' Motion to Strike Claim of Melissa Green [Record No. 1213] is **GRANTED**.

(3)    The United States' Motion to Strike Claim of First National Bank Midwest [Record No. 1219] is **GRANTED**.

(4)    The United States' Motion to Strike Claim of Gayle Garrison [Record No. 1216] is **GRANTED**.

(5)    The United States' Motion to Strike Claim of Cognac, LLC [Record No. 1212] is **GRANTED**.

This 10th day of September, 2010.



Signed By:

*Danny C. Reeves*  DCR

**United States District Judge**